STATE OF MAINE

*vs.*

KENNETH MACKENZIE

Penobscot.   Opinion, May 6, 1965.

*Howard M. Foley, County Attorney,* for the State.

*Gene Carter, Esq.,* for Defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, MARDEN, JJ. SIDDALL, J., sat at argument but retired before opinion was adopted.

MARDEN, J.   On exceptions.   (1) to the denial of a pre-trial motion to suppress evidence and (2) to the trial admission of the evidence to which the motion to suppress had been addressed, — each before a different member of the Superior Court.

The facts, derived from the testimony presented at the hearing on the motion to suppress, out of which exception (1) arises, are as follows:

On the night of March 3-4, 1963 the store of one Hikel was forcibly entered and 2 six-packs of bottled beer (Budweiser), several wrist watches (1 Admiral and 13 Timex), and a coin collection, consisting of both old and mint coins, among other things, were taken.   On the morning of March 4, Officers Rideout and Montgomery of the local police department in the course of investigating the break, and aware that ones Albert, MacKenzie and another had been on the street and drinking the previous night, that Albert had broken into the same store in 1957 and that the method of operation of the two breaks was the same, sought one John Albert for questioning.   They had neither arrest nor search warrant.   It was learned that John Albert was a tenant in W's rooming house, and the officers, aided by the landlady, located and went to separate doors of Albert's room.   In this room was John Albert and an invited guest, Kenneth MacKenzie, the exceptant, neither yet arisen from bed.   While MacKenzie is the party at interest, Albert's participation in the events under review is relevant.

From the moment of the officers' arrival outside Albert's room until the subsequent arrest and removal of both Albert and MacKenzie, the incidents and sequence are confused.   Testimony covering this period supporting the motion to suppress is supplied by MacKenzie and Officer Rideout.   Albert claimed, and was granted, constitutional immunity.   Both witnesses agree that Officer Rideout knocked

on the door, and that Albert said "Who is it?" MacKenzie testified that the reply was "Millinocket Police Department. * * * Open up." Officer Rideout testified that his reply was "Dick Rideout of the Millinocket Police Department, I would like to talk to you." Both MacKenzie and Officer Rideout state that Albert's reply was "just a minute." They agree that shortly thereafter Albert opened the door to his room.

MacKenzie testified that thereupon Officer Rideout "burst himself in the room, forced himself in the room" and that Albert had to move aside or "get shoved down." Officer Rideout testified that Albert opened the door and walked away from the door toward a dresser upon which rested a pack of bottled Budweiser beer, saying "the door is open, come in." On cross-examination were the following questions and answers:

"Q. And you entered into that room in pursuance of your duties as a police officer and under your authority as a police officer?

"A. Yes, sir.

Mr. FOLEY: I object to that question. I would like to have those two questions asked separately.

"Q. Did you enter into John Albert's premises in the performance of your duties as a police officer?

"A. Yes, sir.

"Q. Did you enter into the premises of John Albert at that time under your authority as a police officer?

"A. No, sir, under the authority granted by Mr. Albert.

"Q. When the question was asked the first time your answer was yes.

> "A. You put them both together in the first question."

After Officer Rideout entered Albert's room, Officer Montgomery also entered through the other door, which entry MacKenzie characterizes as "bursting in," "with his hand on his weapon." MacKenzie also adds that "he (it is not clear to whom reference is made) said he would put the lead to me" (if MacKenzie tried to get out of bed). Up to this point MacKenzie remained on the bed and Officer Rideout stated that MacKenzie was in bed with blankets pulled up, with such appearance of sleep that he "woke him by shaking his shoulder" and that "he (MacKenzie) came out of a groggily type of sleep" though it might have been feigned. Albert, after opening the door and heading toward the dresser, continued in his course and procured a bottle of Budweiser beer from a pack on the top of the bureau, and apparently searched for an opener, without success.

The conduct of the officers, which MacKenzie characterized as a search, is described by him as:

> "Q. Would you describe the nature of this search? What did he do?
>
> "A. Well, he was looking *in* (emphasis added) the bureau and found a paper bag, and he looked in the corner and found some other items.
>
> "Q. Do you have any knowledge what those items were?
>
> "A. Ao. (sic). There was two tool boxes he picked up and he said, Montgomery said something about a coin collection, something about coins.
>
> "Q. Did you see him examine any other object in the room?
>
> "A. No.
>
> \* \* \* \*

"Q. Would you tell whether or not he was examining other items?

"A. Yes, he was.

"Q. Would you tell the Court whether or not Officer Montgomery took these articles into his possession?

"A. Yes, he did.

"Q. And would you tell the Court whether or not, if you know, he examined these items?

"A. Yes, he did.

Mr. FOLEY: I will have to object to this because I don't know what this means.

"Q. After Officer Montgomery had examined these items did he make any statement?

"A. He said, that is all we need to hold.

"Q. And what did you take that to mean?

"A. It means that we was arrested.
*  *  *  *

"Q. Were you then placed under arrest?

"A. Yes."

The record is silent as to other statements and acts, if any, of the officer(s) from which MacKenzie concluded that he was under "arrest."

MacKenzie then testified that no restraint was placed upon him, at that time, but that handcuffs were put upon Albert. In the interval between this occurrence, and the time the officers and the men left the room to go to the police station, which MacKenzie states to have been about four or five minutes, MacKenzie states that the officers "went back to the room again to search."

In cross-examination of MacKenzie we have this testimony:

"Q. Now you say the officers made a search of the apartment. You started to say they looked at a paper bag *on* (emphasis added) the bureau, is that right?

"A. I said they looked at the items around the room.

"Q. Well, one statement you made was they looked at a paper bag *on* (emphasis added) the bureau, is that right?

"A. Yes.

"Q. Now isn't it true that Mr. Albert went over to that paper bag just before that and took out a bottle of beer?

"A. I couldn't say yes to that.

\* \* \* \*

"Q. How do you know the officers looked at this bag *on* (emphasis added) the bureau?

"A. Because he had it in his hand.

\* \* \* \*

"Q. The officers didn't touch that bureau or any of the drawers did they?

"A. I would say yes to that question they did.

"Q. You say yes, they did?

"A. I would say yes.

"Q. Do you remember that they did go into the bureau?

"A. I would say yes, they did. They was going around the bureau *on top of it.* (Emphasis added.)

\* \* \* \*

"Q. You say the officer also searched the corner by going over and looking in the corner?

"A. Yes.

\* \* \* \*

"Q. There were some articles there weren't there?

"A. They found some, yes.

"Q. In the corner?

"A. Yes.

"Q. They were just laying on the floor weren't they?

"A. I guess so, yes.

\* \* \* \*

"Q. Where else did they get some articles?

"A. I told you *on* (emphasis added) the bureau."

Later with relation to the bureau.

"Q. You don't know if they took anything out of there do you?

"A. I couldn't rightfully say. I wouldn't say yes or no."

MacKenzie's testimony specifies only two tool boxes and coins in a paper bag as having been taken by the officers from the room.

Chronology of events dealing with the alleged search and seizure and arrest, is reflected by Officer Rideout's testimony on cross-examination, as follows:

"Q. Now once you were in this room, Officer Rideout, did you place either of these people immediately under arrest?

"A. No, sir.

"Q. Isn't it true it was only after you observed certain of the contents of that room you placed these persons under arrest?

"A. Yes, sir. Lying in plain sight.

"Q. Isn't it true that as of that time you made a determination you had probable cause to believe that a felony had been committed and that these persons committed it?

"A. Yes, sir, after the evidence was found.

\* \* \* \*

"Q. It was only after you entered the room and saw the items in the room that you have testified to on direct examination that you made a determination that you had probable cause to make this arrest, is that correct?

"A. Yes, sir."

In neither the testimony of MacKenzie nor that of Officer Rideout are the acts and statements of the occupants in Albert's room related in strict chronology which would be most helpful to the record. For the trial court to have determined the facts, and for us to now determine if there be error in the trial court's conclusion, the record has to be studied with great care to conclude with any degree of certainty in just what order the incidents occurred. The testimony of the exceptant is fairly represented by the excerpts given above. His narration of the key facts is equivocal. With relation to all of the testimony covering the room episode it is not inaccurate to conclude that everything which occurred, took place in less time than it takes to tell it. Observation of unconcealed objects in the room, conversation among the men, and conclusions by the officers from what they saw and heard, certainly were taking place simultaneously. The observation of something in plain

sight, a decision based upon that observation, and a physical act with or without comment naturally occurred in a fraction of the time it takes to write this sentence, and segregating by periods of time the elements of such observation, mental process based upon it, and conduct is impossible. The judge presiding at the hearing on the motion to dismiss was warranted in finding that after the officers entered the room both Albert and MacKenzie began to dress. Immediately upon entering the room a six pack of Budweiser beer was observed on the dresser, but because such an item was not peculiar to Hikel's store, the officers' action was not governed by it. As Albert was dressing, an Admiral wrist watch was observed on his wrist, Officer Montgomery asked to look at it, Albert gave it to him and because such a watch had been taken from the Hikel store and the officers were aware that Hikel's store was the only store in town dealing with that item, its presence was significant. In the process of dressing, Albert asked for his jacket and in the officer's passing the jacket to him, wrist watch straps were protruding from the pocket and Officer Rideout testified: "I found those at the time of the arrest. Almost instantaneously at the time of the arrest was the time of the discovery of the 13 Timex watches, plus the watch on his wrist. That was almost within the same instant."

Meantime, MacKenzie was dressing, in the process of which he attempted to put on two pair of trousers, and when Officer Montgomery asked him if he always wore two pair of trousers, he started to throw the second pair off and in doing so, about two coins fell on the floor, one of them being a gold coin.

The exact time and manner of execution of his arrest is not fixed by MacKenzie. The testimony recited above justifies only the conclusion that after the officers observed the gold coin fall from the trousers pocket and unidentified

articles *on* the bureau and *in* the corner, he was arrested. This does not conflict with Officer Rideout's testimony. Both MacKenzie and Officer Rideout say that immediately after the arrest one or the other did search *in* the bureau, where nothing of significance was found, but a large quantity of foreign coins was found *in* a paper bag, which was *on* the floor, change, foreign and mint coins were *in* a shoe *on* the floor and coins were found within a wardrobe in the room. Nothing was seized from within anything except as just noted.

Both Albert and MacKenzie were in due course charged with breaking and entering Hikel's store in the nighttime and larceny of the items referred to.

After indictment, dated April 4, 1963, and pre-trial, the exceptant filed a motion to suppress the evidence obtained at Albert's room, claiming that the officers' entry, search and seizure were illegal, that "the officers then acting in concert forced respondent (MacKenzie) and John M. Albert to the floor and handcuffed them," then proceeded to make an illegal general search and seizure of unspecified items belonging to said Albert.

This alleged conduct attributed to the officers culminating in the application of handcuffs is not supported even by MacKenzie's testimony.

The recited basis for the allegation of the illegal search and seizure was that the entry and search were without warrant, without consent of either Albert or the exceptant, that any arrest was without probable cause and that the search was not incident to a lawful arrest.

The motion to suppress was heard April 24, 1963, and the decree of the presiding justice dated and filed April 29, 1963, in which the motion to suppress was denied. Exceptions to the denial of the motion to suppress were filed and allowed.

From the bill of exceptions, it appears that the presiding justice denied the respondent permission to file, pending trial and verdict, an extended bill of exceptions to the denial of the motion, to which the respondent also claimed exception. This exception was not pressed before this court.[1]

On September 19, 1963, the charge against Albert and MacKenzie came on for trial, at which time Albert pleaded guilty, and in due course was called and responded as a witness for the State. Upon MacKenzie's trial the respondent seasonably objected to the evidence within the scope of the motion to suppress, based upon evidence then before the trial court, and the record of the evidence taken at the hearing on the motion to suppress. Upon the overruling of respondent's objection, and the admission of the evidence, respondent took exception (2).

Inasmuch as this is a case of first impression dealing with a motion to suppress, supported by the ruling in *Mapp* v. *Ohio*, 367 U. S. 643, 81 S. Ct. 1684 (1961), we propose to deal with the issues with reasonable fulness. Wherein constitutional issues are involved we shall cite decisions of the United States Supreme Court, the Circuit Courts and the District Courts in order of their availability,

---

[1] And rightly so. Except in such cases as the pre-trial motion raises an issue independent of the criminal charge, as, for example, a motion to return seized property, the ruling is interlocutory and may be reviewed only after final judgment in the case. See *United States* v. *Wallace & Tiernan Co., Inc., et al.*, 336 U. S. 793, 69 S. Ct. 824, [6-8] 829 (1949); *DiBella* v. *United States*, 369 U. S. 121, 82 S. Ct. 654, [9] 660 (1962). This principle is recognized in Rule 73 M.R.C.P. except as affected by Rule 72(c) M.R.C.P., both of which may be expected to appear in our proposed Rules of Criminal Procedure. While we have not been called upon to interpret Rule 72(c) M.R.C.P., the interpretation given in *DiBella* for the federal rule is persuasive. A need has been recognized for exception to the rules as applied to interlocutory orders "in certain types of proceedings where the damage of error unreviewed before the judgment is definitive and complete, * * * has been deemed greater than the disruption caused by intermediate appeal." *DiBella* [3] at page 657.

and, for want of the same, decisions of State Courts of last resort. The legal issues are as follows:

(1) Upon what basis is the denial of the Motion to Suppress to be reviewed?

(2) Was the entry of Albert's room by the officers lawful, as applied to MacKenzie?

(3) Was there a search before arrest?

(4) When was an arrest made?

(5) Was there a search incidental to the arrest?

### Test of the Superior Court Ruling

By what rule is the finding of the single justice to be reviewed?

The finding of the single justice "shall not be set aside unless clearly erroneous." Rule 52 M.R.C.P.

While the criterion by which the finding of the single justice is to be reviewed has been expressed in varying terms (See Reporter's Notes under Rule 52, M.R.C.P. and § 52.7 Field and McKusick's Maine Civil Practice), such terms are synonymous with "clearly erroneous."

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 395, 68 S. Ct. 525, 542; rehearing denied 333 U. S. 869, 68 S. Ct. 788.[2]

The basis of our civil rule 52 and the test to be applied is that "due regard shall be given to the opportunity of

---

[2] We adopt this rule not unaware that *United States* v. *Page*, 302 F. (2nd) 81, 84 (9 CCA 1962) in reviewing a motion to suppress considered a distinction between a "substantial evidence" rule and a "clearly erroneous" rule.

the trial court to judge of the credibility of the witnesses." This principle has been affirmed in reviewing a motion to suppress in *In re Fried, et al.,* 161 F. (2nd) 453, [1, 2] 457 (2 CCA 1947), certiorari denied 67 S. Ct. 1751 and certiorari dismissed 68 S. Ct. 105; *Burge* v. *United States,* 332 F. (2nd) 171, [1-3] 173 (8 CCA 1964).

### OFFICERS ENTRY OF ALBERT'S ROOM

While Albert is not a party to this case, the rights of MacKenzie in at least two significant areas (entry and disclosure of stolen goods) are affected by Albert's status and conduct at the scene under consideration. The only person who had any proprietary or possessory rights in the room involved, was Albert. He was the tenant, he was present, and he was in possession. He was the only person present to whom the constitutional right to have his "house" free from unreasonable searches and seizures was extended.[3] He, as an accused, did not challenge the entry of the officers. He did not testify at the hearing on MacKenzie's motion to suppress evidence and MacKenzie did not testify at that hearing that Albert challenged, in any way, the entry of the officers. The exceptant, MacKenzie, had "standing" neither then nor now to challenge the entry of the officers. The entry is not significant per se. It is significant only as it bears upon any subsequent search and seizure of property affecting MacKenzie's rights.

It is in no way contended that the officers physically forced their way into Albert's room. The legal question is

[3] U. S. Constitution, Amendment 4. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *." Constitution of Maine, Article I, § 5. "The people shall be secure in their persons, houses, papers and possessions from all unreasonable searches and seizures * * *."

The motion to suppress alleges "illegal entry and search of certain premises * * * lawfully rented to * * * Albert * * * and used by said * * * Albert as his home, place of abode and residence" which premises the exceptant "was then and legally upon."

whether the officers were invited, expressly or impliedly, by Albert, to enter the room or whether, as urged by exceptant, the principles of *Johnson* v. *United States*, 333 U. S. 10, 68 S. Ct. 367 (1947), as to the entry apply. *Johnson* is urged upon us as controlling wherein, on facts somewhat analogous, the court held that the officers gained entrance, without warrant, to Johnson's living quarters "under color of office" and that admission was granted "in submission to authority rather than as an understanding of intentional waiver of a constitutional right" [1] at page 368. In *Johnson* the petitioner to suppress evidence was the accused and the person whose living quarters were entered. The case would be on point were Albert the exceptant here. In *Johnson* the tenant upon being informed that a Lieutenant Belland was at the door, who stated that he wished to talk with her, "stepped back acquiescently and admitted" the officers.

The rationale of the court is that the tenant, overawed by the mere presence at the door of a Lieutenant (the case does not indicate that she was aware he was a police lieutenant), did not voluntarily permit the officers to enter, and that any evidence thereafter found by a search should have been suppressed. We do not accept *Johnson* as controlling the facts of this case.

The single justice here found, upon disputed facts, that Officer Rideout's entry of Albert's room was with Albert's permission, voluntarily given and his volition unaffected by any aura of the law. As applied to the entry, no constitutional violation is established. There is no error in the conclusion of the single justice, — even though MacKenzie were in a position to challenge it.[4]

[4] We recognize the distinction between "standing" to challenge the entry and "standing" to challenge the use in evidence of material gained by search and seizure after entry. See *Jones* v. *United States*, 80 S. Ct. 725 (1960).

## Search, Arrest, Search Incidental to Arrest

The motion to suppress is grounded upon an alleged unlawful search for and seizure of property which might be offered in evidence against the exceptant. As the word "search" is both defined and implies, "a search implies some exploratory investigation. It is not a search to observe that which is open and patent, * * * ." *State* v. *Griffin, et al.*, 202 A. (2nd) 856, [3-4] 861 (N. J. 1964) ; *United States* v. *Lee,* 274 U. S. 559, 563 (1927) ; *Ker* v. *State of California,* 83 S. Ct. 1623, IV 1635 (1963) ; *Petteway* v. *United States,* 261 F. (2nd) 53, 54 (4 CCA, 1958) ; *United States* v. *Lee,* 308 F. (2nd) 715, [2, 3] 717 (4 CCA, 1962) ; and *State* v. *Nelson,* 196 A. (2nd) 52, [5, 6] 57 (N. H. 1963).

In the present case it is urged that there was an unlawful search before the arrest and that the arrest was based upon the search rather than the search being based upon (incidental to) the arrest, which, by *Johnson, supra,* [9] page 370 is constitutionally prohibited.

Here again the involvement of Albert, as well as MacKenzie, the statements and the reported conduct of all four men present leads to an unoriented state of facts.

An arrest in criminal law "signifies the apprehension or detention of the person of another in order that he may be forthcoming to answer for an alleged or supposed crime." 5 Am. Jur. (2nd) Arrest, § 3.

> "The elements of an 'arrest' comprehend a purpose or intention to effect an arrest under a real or pretended authority, the actual or constructive seizure or detention of the person to be arrested by the one having the present power to control him, communication by the arresting officer to the one whose arrest is sought of his intention or purpose then and there to make the arrest, and an understanding by the person who is to be arrested that

it is the intention of the arresting officer then and there to arrest and detain him." *Range* v. *State,* 156 So. (2nd) 534, [1-3] 536 (Fla. D. C. of Appeals, 1963).

As defined by the court in *Commonwealth* v. *Holmes,* 183 N. E. (2nd) 279, 280 (Mass. 1962) "(t)o constitute an arrest there must be either a physical seizure of the person by the arresting officer, or a submission to his authority and control."

There is no dispute that after the officers entered the room and before there was an arrest of anyone, a new Admiral watch was observed on Albert's wrist. The watch was recognized as of a type stolen, the observation of its presence was made and upon inquiry Albert handed the watch to one of the officers. There was no search involved. It is clear that at this point Albert was placed under arrest, by the application of handcuffs, and the arrest without warrant was lawful, a felony having been committed, if the officer had "reasonable grounds of suspicion," *Palmer* v. *Maine Central Railroad Company,* 92 Me. 399, 408, 42 A. 800, that the person arrested was guilty of the felony. *Therriault, et al.* v. *Breton, et al.,* 114 Me. 137, 142, 95 A. 699.

"Reasonable grounds" and, as more often expressed, "probable cause" to justify an arrest are synonymous. See *Brinegar* v. *United States,* 69 S. Ct. 1302, [8-9] 1310 (1949) rehearing denied 70 S. Ct. 31 (1949); *Draper* v. *United States,* 79 S. Ct. 329, [5-7] 333 (1959); *United States* v. *Smith,* 308 F. (2nd) 657, [2] 661 (2 CCA, 1962).

The trial justice was without error in holding that Albert's arrest was lawful.

Whether or not MacKenzie was placed under arrest at the same time is not clear. The fact that MacKenzie "took it (remark by officer) to mean" that he was arrested is not

controlling. No physical restraint was placed upon him. Assuming that MacKenzie were arrested at the same time as Albert, the validity of the arrest would depend upon whether the officers, by the observation of the wrist watch, had probable cause to believe that MacKenzie, as well as Albert, had committed the break. This poses a narrow question and if the result of the case depended upon its solution, reasonable minds might well differ.

Assuming, but not deciding, that such an arrest of Mac-Kenzie was without probable cause, the result is unchanged. At approximately the same time, bearing in mind that the scene was developing during all of the time that the officers were in Albert's room, MacKenzie had started to dress and after putting on one pair of trousers, he started to put on a second pair, which elicited comment from Officer Montgomery. At this comment, MacKenzie threw off the second pair of trousers, out of which fell one or more coins, one being gold, which, by its very composition, immediately impressed, and was recognized by, the officers as typical of a coin collection. There was no search involved in this observation. There is no search established between the observation of the watch, by reason of which Albert was arrested, and the observation of the gold coin, by reason of which MacKenzie was arrested. If MacKenzie had not theretofore been arrested, the trial court very properly found that "probable cause" or "reasonable grounds" existed for an arrest at that point in the proceedings. See *Carter* v. *State*, 204 A. (2nd) 322, [6, 7] 324 (Md. 1964). Each man by his inept conduct supplied the officers with reasonable grounds for his arrest. It is not known whether the second pair of trousers belonged to MacKenzie, whereby it could be argued that the gold coin was in his possession, but his purpose in donning this second pair of trousers suggested either that the trousers were his, or that he proposed to claim and possess them for some reason, to wit,

an awareness of the fact that the trousers contained something of value. There was no search prior to exceptant's lawful arrest.

There is no dispute that after both men had submitted to the control of the officers, and were about to be removed from the room to the police station, the officers did enter a wardrobe where more of Mr. Hikel's coins were found, the pockets of the trousers which MacKenzie had sought to put on were found to be filled with stolen coins and other coins from the Hikel collection were found in a shoe in a corner of the room. Such exploration of the wardrobe and the bureau or dresser, within the Albert room (the area within his control) subsequent to the valid arrests was incidental thereto and lawful. Varon, "Searches, Seizures and Immunities," Section 5, page 103, *United States* v. *Rabinowitz,* 70 S. Ct. 430, [3] and [4] 433 (1950), *Ker, supra* at IV 1634, *Robinson* v. *United States,* 327 F. (2nd) 618, [1, 2] 622 (8 CCA 1964) ; and *State* v. *Doyle,* 200 A. (2nd) 606, [5-8] 611 (N. J. 1964), which last case seems to liberalize the federal rule.

In brief, the record of the hearing on the motion to suppress supports the conclusion of the fact finder that, as to MacKenzie, there was a lawful entry of the Albert room, that there was no unlawful search, that there was probable cause established by visible evidence for Albert's and Mac-Kenzie's arrests, that search promptly subsequent to the arrest within the area under Albert's immediate control was incidental to the arrest and lawful, and that the motion to suppress all evidence which the visit yielded was properly denied. Exception (1) is overruled.

At trial, the admission of the evidence as to what was seen, heard and found at the Albert room was governed by the subsisting finding of competence theretofore made on the pre-trial motion to suppress and evidence, if any, which

had been admitted prior to the objection. When exceptant's counsel voiced objection at trial "to any evidence that was obtained as a result of the entrance into John Albert's apartment" no evidence additional to that recorded at the hearing on the motion to suppress was before the court. The trial court's overruling of the objection was correct. Exception (2) is overruled.

*Exceptions overruled.*

*Judgment for the State.*