STATE of Maine

v.

Michael KELLY.

Supreme Judicial Court of Maine.

July 21, 1977.

Thomas E. Delahanty, II, Dist. Atty., Herbert Bunker, Jr., Deputy Dist. Atty., Auburn, for plaintiff.

Thomas M. Mangan, Lewiston, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD and GODFREY, JJ.

WERNICK, Justice.

An indictment returned June 29, 1976 charged that on May 21, 1976 defendant Michael Kelly committed the crime of "burglary" (17–A M.R.S.A. § 401) at the Montello School in Lewiston as well as the crime of "theft" from the school of assorted hand and power tools (17–A M.R.S.A. § 353). Pursuant to 15 M.R.S.A. § 2115–A, the State asks this Court to review a pre-trial ruling of a Justice of the Superior Court (Androscoggin County) suppressing particular matters as evidence.

I.

Preliminarily, we must consider the nature of the review we are here asked to undertake since, on one alternative conception of it, the steps taken by the State to achieve review could affect our jurisdiction to consider the case.

On July 22, 1976 the Superior Court heard and decided in defendant's favor motions of defendant to suppress as evidence against him his confession and also the fruits of a warrantless police search of his automobile. Within ten days, on July 28, 1976, the State, purportedly acting pursuant to the "appeal" right conferred by 15

M.R.S.A. § 2115–A,[1] filed a "Notice of Appeal" (in contradistinction to the "motion for interlocutory report" prescribed by Rule 37A(b) M.R.Crim.P., as the mechanism by which the State shall take a § 2115–A "appeal" from an interlocutory order or ruling). Included in that filing was the signed approval of the Attorney General concerning the "within *appeal*" (emphasis supplied).

Subsequently, apparently to proceed in conformity to Rule 37A(b) M.R.Crim.P., the State also filed a motion for an interlocutory "report" to this Court. This was not done, however, until August 17 long after expiration of ten days from entry of the Superior Court Justice's pre-trial ruling and order of July 22. Defendant formally opposed the motion on August 24. On September 21 the presiding Justice ordered that the State's interlocutory "report" should proceed.

Under § 2115–A the State must take its "appeal" from a pre-trial order within 10 days after ". . . [it] has been entered": —here, within ten days after July 22, 1976. Rule 37A(b) provides that the State's invocation of the Law Court's review of an interlocutory order shall be by a

"motion by the State to have . . . [said] order . . . reported to the Law Court . . . made within ten days after the entry in the criminal docket of such order . . . ."

Since the State here filed its "Notice of Appeal" within 10 days after entry of the pre-trial interlocutory order but did not file its motion for interlocutory "report" until long after expiration of said ten day period, the question squarely raised for our consideration is whether the State has a right of interlocutory *appeal* which is independent of the interlocutory *report* provisions of Rule 37A(b).

■ The logical beginning of our analysis is our conception that the legislative grant of jurisdiction to the Law Court in 4 M.R.S.A. § 57 concerning "cases on appeal", and

"questions of law arising on reports of cases, including interlocutory orders or rulings of such importance as to require, in the opinion of the justice, review by the law court before any further proceedings in the action",

encompasses, as to criminal prosecutions, *only* "appeals" taken by the defendant and "interlocutory reports" sought, or agreed to, by the defendant. Because granting the State "review" rights in a criminal prosecution would be

". . . so serious and far-reaching an innovation in the criminal jurisprudence of the United States" *United States v. Sanges*, 144 U.S. 310, 323, 12 S.Ct. 609, 614, 36 L.Ed. 445 (1892),

as well as in the criminal jurisprudence of the State of Maine, important public policy is involved and, hence, this is a substantive, rather than procedural, area. Accordingly, the question of whether to grant rights of "review" to the State, in relation either to the final judgment or the interlocutory facets of a criminal prosecution, is to be decided by the Legislature. Further, rights of such substantive importance will not be taken to have been legislatively conferred by indirection or implication but only by legislation explicitly addressing the subject in express language of unmistakably plain meaning.

Section 2115–A, as forthcoming in 1968, was such a legislative enactment. The nature and scope of the substantive rights it conferred upon the State are to be ascertained in accordance with the usual principles of statutory interpretation.

1. Section 2115–A provides in pertinent part: "*1. Appeals prior to trial.* An appeal may be taken by the State in criminal cases on questions of law, with the written approval of the Attorney General, from the District Court and from the Superior Court to the law court from a decision, order or judgment of the court suppressing evidence prior to trial, allowing a motion to dismiss an indictment, complaint or information, quashing an arrest or search warrant or suppressing a confession or admission, or ruling against the State in any pretrial order. Such appeal shall be taken within 10 days after such order, decision or judgment has been entered, and in any case before the defendant has been placed in jeopardy under established rules of law. Any appeal which may be taken under this section shall be diligently prosecuted."

On this approach, we conclude that as applied to the interlocutory pre-trial rulings here involved, the manifest import of § 2115–A is that the Legislature conferred upon the State a substantive right of interlocutory appeal which is "absolute" in the sense that, upon the written approval of the Attorney General, the State may resort to such interlocutory appeal *without further need to procure prior judicial approval.*

Addressing, first, the textual language of § 2115–A, we stress that the statute never uses the word "report"; indeed, it never uses a neutral term such as "review." Instead, the statute speaks repeatedly and without ambiguity of "appeal." The Legislature must be taken to have been aware of the existence of, and the differences between, an "appeal" and a "report." See, for example, 4 M.R.S.A. § 57. Had the Legislature intended to provide for Law Court review by any method other than an *appeal,* we think the Legislature knew how to do it, and could have done it, by plain and express language. That the Legislature saw fit to use the same word "appeal" concerning the State's rights in interlocutory as well as final judgment contexts is convincing to us the Legislature intended that as to interlocutory orders or rulings the State has a *genuine appeal* and not merely the opportunity for a "report" upon judicial approval.

The legislative history, and debate, leading to the enactment of § 2115–A cogently confirms such plain import of the statute's textual language.

In an "Appendix" attached to this opinion we have distilled and analyzed the legislative history and debate from which § 2115–A emerged. The conclusion produced by that analysis is that by § 2115–A the Legislature conferred upon the State a substantive right to appeal from interlocutory orders or rulings made in a criminal prosecution which the Legislature intended to be as "absolute", once there is written approval by the Attorney General, as is the right of the defendant to appeal from a final judgment of conviction.

This being so, the 1969 amendment to Rule 37A(b) M.R.Crim.P., which purported to transform the State's right to appeal from interlocutory rulings or orders into an interlocutory *report,* conflicted with what we now perceive, in our examination of the entirety of the question in an actual case, to be essential to the substantive right created by the Legislature. Such a fundamental substantive alteration cannot be taken to have been within the contemplation of the Legislature's provision in § 2115–A(3) authorizing the Supreme Judicial Court to deal "by rule" with the "manner and . . . conditions" of the State's taking of an interlocutory appeal in a criminal prosecution. By this language the Legislature authorized only such "rule" prescriptions as would be within the usual scope of rule-making, to-wit, "pleading, practice and procedure." 4 M.R.S.A. § 9.

We decide, therefore, that under § 2115–A the State has a right of interlocutory *appeal* which is independent of any proceedings by way of interlocutory "report." In any particular criminal prosecution the State may resort to this right of interlocutory appeal solely upon the written approval of the Attorney General, as statutorily specified, and without need to procure prior judicial approval.[2]

Here, the State took its interlocutory appeal in accordance with the procedure specified in § 2115–A as amplified by Rule 39F M.R.Crim.P. It filed a notice of appeal within ten days after entry of the pre-trial order or ruling appealed from, and this filing included a written approval of such action signed by the Attorney General. This sufficiently established our jurisdiction to consider the issues the State wishes us to review.

---

**2.** Until the Supreme Judicial Court shall promulgate rules further implementing the import of this decision, the State's appeal from an interlocutory ruling or order made in a criminal prosecution shall proceed in accordance with the provisions of Rule 37A(c) as pertinent to the manner in which an "appeal" is to be perfected.

## II.

The evidence presented at the hearing on defendant's motions to suppress warranted the following findings of fact.

Close to midnight on May 22, 1976 the Lewiston Police Department received a call from a woman[3] babysitting in an apartment at 117 Pierce Street in Lewiston. The caller reported that her wallet was missing. She said that the wallet had been in her handbag on the kitchen table about a half hour earlier. She had been watching television in another room with defendant until he left at that time. Since defendant had been the only other person on the premises, the victim concluded that he had stolen her wallet. In addition to relating this information to the police, the caller described the car in which defendant had left as "a black-over-gray Buick." The Lewiston Police Department broadcast these particulars to all cars.

At approximately 1:30 or 1:45 that morning, May 23, 1976, Officer Vitale of the Lewiston Police Department noticed a vehicle meeting the broadcast description. It was heading out of town on the so-called Lisbon Road. Vitale stopped the vehicle and approached the driver. Vitale immediately recognized this person, the defendant, from his past contacts with him. Vitale asked defendant for his operator's license and the registration of the car. This request occasioned much rummaging in the glove compartment by defendant with the car's console light on. During this time Officer Vitale watched the compartment carefully. From behind, he flashed his light at it and saw a wallet which he was satisfied was not that of the woman who had called.

Defendant demanded to know why he had been stopped, and Vitale replied that the police had information that defendant had stolen a wallet and wanted to talk to him. Vitale asked defendant if he would be willing to come to the station to help clear up the matter. Defendant agreed to do so and asked whether he should drive his car or ride with the officer. Vitale told defendant to drive his own car. Defendant then started off and Vitale followed. Vitale observed no indication of intoxication from the manner in which defendant spoke or operated his vehicle.

The pair soon arrived at the police station where Vitale left defendant and went to find Captain Normand Cloutier. Defendant was invited into Cloutier's office to answer questions. After Captain Cloutier read "*Miranda*" warnings to defendant, defendant said that he waived the rights therein enumerated. Cloutier then asked whether defendant had stolen the wallet. Defendant denied the theft. Captain Cloutier inquired of defendant whether Officer Vitale could search his automobile, and defendant gave his consent.

Defendant himself drove the car from the street where he had parked it into the lighted police garage. When Officer Vitale first started looking in the front seat for the wallet, defendant entered the car and began searching the same area, allegedly for a lost key. Vitale thereupon proceeded to examine the back of the car. Finding nothing, he asked defendant's permission to look in the trunk. Defendant agreed and helped open the trunk by using a screwdriver.

In the trunk were several small saws. Certain features of these saws matched a description of tools taken from the Montello School two nights earlier (May 21, 1976). Officer Vitale compared the serial numbers, and on finding that they were indeed the property stolen from the School, he seized the saws.[4]

Vitale informed Captain Cloutier that he believed defendant responsible for the School burglary. Defendant was brought into Cloutier's office, told he was being held for that reason, and again given "*Miranda*" warnings. Defendant then confessed orally to the burglary and theft at the Montello School and later signed a written account of his acts prepared by Captain Cloutier.

3. The record does not indicate whether the woman gave her name.

4. The wallet was eventually found between the two front seats; defendant then admitted that he had stolen it.

Officer Vitale and Captain Cloutier both testified that defendant did not appear intoxicated and acted normal, if nervous, during the three hours he spent at the Lewiston Police Station. Defendant, on the other hand, claimed he was severely impaired by alcohol. He produced two witnesses who described him as being drunk shortly before he was stopped by Officer Vitale.[5] The presiding Justice ruled specifically that he believed the version of defendant's condition given by defendant and his witnesses rather than the police account.

Defendant's motion to suppress as evidence his confession and also the property seized from the trunk of his automobile may fairly be taken to assert: (1) the episode on Lisbon Road constituted an illegal arrest which vitiated the subsequent consent to search and the confession, and (2) in any event, both the consent to search and the confession were not voluntary because defendant's intoxicated condition made him incapable of waiving constitutional rights.

The presiding Justice made alternative rulings.

First, finding as facts that:

". . . defendant was stopped . ., the Officer did not consider that he was in custody at that time, but merely requested if he would voluntarily go to the Police Station",

the Justice decided:

(1) ". . . the test must be not what the Officer believes, but what the average reasonable person in the position of the defendant would have felt, whether he was free to go"; and

(2) ". . . under these circumstances, the average person would not have felt that he was free to go, . . . if he did leave . . . it would be a very brief time before he was actually physically taken into custody, and it would be made clear to him that he was not free to go."

On this basis, the presiding Justice concluded that defendant, in legal contemplation, had been arrested. Holding the arrest unlawful,[6] the Justice further reasoned that the illegal arrest irretrievably tainted the subsequent search and confession.

Second, on the hypothesis that there was no arrest of defendant on the Lisbon Road and therefore no possibility of taint, the presiding Justice ruled "involuntary" defendant's consent to the search of his vehicle on the grounds that defendant was tired and under the influence of intoxicating liquor. Therefore, in the Justice's view, any subsequent arrest for conduct which had been revealed by fruits of this unlawful warrantless search must be deemed tainted and likewise unlawful, and the confession forthcoming after defendant was unmistakably under such unlawful arrest was automatically vitiated.

In addition to these dispositive rulings, the Justice offered the additional conclusions that even though defendant had not voluntarily consented to the search, defendant gave his confession voluntarily.

## II–A.

We deal first with the question of whether there was in legal contemplation an arrest of defendant on Lisbon Road. We decide that the presiding Justice was in error in ruling that there was an arrest. The error arose because the presiding Justice used the wrong criteria for determining the existence of an arrest insofar as: (1) he was guided by what a reasonable person in *defendant's position* could be taken to have believed and (2) he treated as controlling, to override the fact that the officer had merely asked defendant if he was willing to

---

5. Actually, the testimony of defendant and his two witnesses injects confusion as to when defendant claimed to be intoxicated, the three of them relating the events as occurring late on May 21 and in the early morning hours of May 22. The police records, however, place the events in question a day later—that is, between approximately 11:00 p. m. May 22 and 5:00 a. m. May 23.

6. The presiding Justice deemed the arrest unlawful because he thought that the arresting officer lacked probable cause to believe that defendant had committed a crime.

accompany him to the Police Station, that the defendant could reasonably have believed that were he to refuse the request, the officer would then assert custodial authority over his person.

 Whether there has been a governmental intrusion upon a person's freedom deemed sufficient to bring into play the legal consequences attaching to an "arrest" is not correctly determined by confining the focus of inquiry to the perspective of only one of the participants, i. e., the person subjected to intrusion. The perspective must be that of the outside observer who views the entirety of the situation. This encompasses all the circumstances bearing upon the objectively ascertainable intent of the intruding police officer as well as of the person subjected to intrusion. See, e. g., *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *State v. MacKenzie*, 161 Me. 123, 210 A.2d 24 (1965); *State v. Babcock*, Me., 361 A.2d 911, 914–915 (1976). See also: *State v. Inman*, Me., 350 A.2d 582, 597–599 (1976); *State v. Clark*, Me., 365 A.2d 1031 (1976).

 Thus, here, even if defendant reasonably believed that, despite the officer's use of language of "request", were he to refuse to accede to the request, the officer would thereafter take him into custody, such belief of the defendant cannot be legally sufficient to establish an arrest of defendant before the police officer in fact acts in a manner constituting the assertion of control over defendant's person. *State v. MacKenzie*, supra, pp. 138–139 of 161 Me., 210 A.2d 24; *United States v. Brunson*, 549 F.2d 348, 358 (5th Cir. 1977). Likewise, the subjective intention of the police officer to assert custodial control, absent some objective manifestation of effectuating the intent, is not per se determinative of the issue. *People v. Allen*, 28 A.D.2d 724, 281 N.Y.S.2d 602 (1967). .

7. See: n. 6, supra.

8. Because we therefore need not assess whether such conduct was "sufficiently an act of free will to purge the primary taint of the unlawful invasion", *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963), we do not reach the question whether

[12] Without considering the propriety of the presiding Justice's conclusion that one in defendant's position would have reasonably believed as the presiding Justice described, we decide that there was no arrest here in view of (1) the express finding by the presiding Justice that Officer Vitale intended none; (2) the lack of probable cause; [7] (3) the failure of the officer to order defendant about in any respect, and (4) the absence of the indicia of detention such as a frisk, handcuffing and other physical contact. *State v. Babcock*, supra; *Huebner v. State*, 33 Wis.2d 505, 147 N.W.2d 646, 651–652 (1967). As was said in *United States v. Brunson*, supra, a case similar to that before us:

"Brunson knew what the investigators did not, that he . . . [was guilty]. . . . [I]t would not be surprising if he did think the investigators had come to arrest him. But they did not come for that purpose, and they told him so. Under these circumstances, Brunson's own expectations cannot convert an otherwise innocent request to talk to investigators into a Fourth Amendment 'seizure.' " (p. 358 of 549 F.2d)

We conclude that what occurred here was an investigatory "stop" based on sufficient "articulable facts" under the rationale of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Babcock*, supra, at p. 914; *State v. Clark*, supra, at pp. 1033–1034. There was thus no unlawful invasion of Fourth Amendment rights and concomitant potential for taint.

## II–B.

Having determined that there was no illegal arrest on the Lisbon Road which could have colored later conduct,[8] we turn

the Justice erred in his seeming application of a rule that an illegal arrest automatically, and without exception, requires suppression of evidence derived thereafter. See, e. g., *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

to consideration of defendant's consent to search his automobile and his subsequent confession of the Montello School burglary.

The presiding Justice expressly found that defendant was "extremely tired" and had been drinking. He also found that "the degree of his drinking did not . . . affect his ability to drive a motor vehicle." Rather, defendant "drove a car very well." The presiding Justice concluded:

"[U]nder . . . the totality of these circumstances, I find that it would be fundamentally unfair to consider that this consent [to search the automobile] was a voluntary consent . . . ."

Yet, as already noted, the presiding Justice further found that defendant's confession of the Montello School burglary was voluntary despite some impairment by alcohol and sleepiness because

"[defendant] was not suffering from the degree of intoxication where there is a mania as defined in *State versus Warner* [Me., 237 A.2d 150, 160 (1967)]."

The Justice also specifically found lack of "mania" in regard to defendant's condition vis-a-vis the consent to search.

We perceive errors of law inherent in the approach of the presiding Justice which necessitate remand for reconsideration of defendant's motions to suppress in light of correct legal principles.

The findings and conclusions of the presiding Justice indicate that he conceived the inquiry into the voluntariness of the confession to be different from that directed to the voluntariness of the consent to the search. Thus, when testing the confession, he referred to *State v. Warner*, supra, a case discussing competence to waive the 5th Amendment privilege against self-incrimination. Turning to the consent to search, the Justice seemed no longer concerned with the *Warner* evaluation of the effects of intoxication upon voluntariness but appeared to be guided solely by *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), a case discussing waiver of 4th Amendment rights in a context in which intoxication was not a factor.

What the presiding Justice may have failed to recognize—and what we attempt here to clarify—is that in both instances the ultimate issue is defendant's competence to waive a constitutional privilege regardless of the particular constitutional provision which may be the source of the privilege. Thus, the inquiry into the voluntariness of a confession focuses upon the same ultimately governing determinant as the inquiry into whether there has been a genuine consent to a search. This was plainly recognized in *Schneckloth v. Bustamonte*, supra, in which the United States Supreme Court examined the issue whether the fruits of a consent search should be suppressed where officials failed to inform the consenting party of his right to withhold consent in light of

"extensive judicial exposition of the meaning of 'voluntariness' . . . developed in those cases in which the Court has had to determine the 'voluntariness' of a defendant's *confession* . . . ." (p. 223 of 412 U.S., p. 2045 of 93 S.Ct.) (emphasis supplied)

Normally, then, the question whether a person was so intoxicated as to be incapable of a "voluntary" waiver of constitutional rights or privileges, whether they arise under the 4th or 5th Amendment, will turn on the same evidence and receive the same answer. Here, nothing in the factual circumstances of time, place or other surrounding conditions reasonably suggested that, by the application of the correct legal criteria, defendant's consent to the search would be held not voluntary but his confession voluntary. This was the anomalous outcome, here, because the presiding Justice erroneously believed that the voluntariness of the consent to the search was governed by a legal criterion different from that governing the voluntariness of the confession.

Further, various comments of the presiding Justice persuade us that he arrived at this misconception because of possibly ambiguous language in *State v. Warner*, supra. We therefore take this opportunity to clarify the import of that decision.

■ In *State v. Warner* we rejected a proffered per se rule to the effect that proof that defendant was intoxicated when he waived constitutional privileges will, without more, bar the fruits of that waiver from evidence. Instead, following a majority of other jurisdictions, we designated intoxication a matter normally relevant to weight of evidence, limiting its function as a factor requiring outright suppression only where

"[i]t is shown that the accused was intoxicated to the degree of mania, or of being unable to understand the meaning of his statement . . . ." (p. 160 of 237 A.2d)

■ Our use of the word "mania" has, unfortunately, obscured the condition we sought to describe, namely, "being unable to understand . . . meaning . . ." (p. 160 of 237 A.2d) In *Warner* we were not intending to import into the assessment of the effect of alcohol on the voluntariness of a waiver of constitutional rights or privileges such considerations as would be necessary to excuse from criminal responsibility because the conduct was affected by mental disease or defect. Cf. *State v. Collins*, Me., 297 A.2d 620, 629 (1972). Rather, and as our subsequent cases make clear, a person under the influence of alcohol waiving constitutional rights is legally competent to do so if, despite the degree of intoxication, he is

"aware and able to comprehend and to communicate with coherence and ration-

ality." *State v. Hazelton*, Me., 330 A.2d 919, 924 (1975)

See also: *State v. Peterson*, Me., 366 A.2d 525 (1976); *State v. Collins*, supra.

One final point remains for clarification.

■ As we earlier noted, since the ultimate substantive criterion governing as to voluntariness—either in the context of a confession or of a consent to a search—is the same, generally on similar facts the determination should be the same. Conceivably, different determinations can be forthcoming because of differences in the quanta of proof required.[9] Here, however, the determinations reached by the presiding Justice cannot be thus explained since they are the reverse of what could eventuate by application of the different legal standards as to quanta of proof.

The entry is:

Appeal sustained; case remanded to the Superior Court for reconsideration of defendant's motion to suppress in light of the opinion herein.[10]

DELAHANTY, J., did not sit.

All Justices concurring.

### APPENDIX

Analysis of Legislative History and Debate, re 15 M.R.S.A. § 2115–A

When, in 1968, the Legislature considered whether, and the extent to which, the State should be authorized to have the Law

9. In *State v. Collins*, Me., 297 A.2d 620 (1972), we decided that when the voluntariness of a confession is in issue, voluntariness must be proved beyond a reasonable doubt because under both the Constitutions of the United States and of Maine the privilege of self-incrimination contains an *inherent* evidence exclusionary principle. This is lacking in the delineation of the constitutional right to be free of certain governmental searches and seizures. Hence, the voluntariness of consent to validate a warrantless police search or seizure need be shown only by a preponderance of the evidence. *State v. Heald*, Me., 314 A.2d 820, 829 (1973).

10. On appeal the state pressed upon us a theory, not raised by it at the trial level, purporting to justify the search of defendant's automobile independently of defendant's consent—on the

rationale that there was probable cause for a search and the circumstances were exigent. See, e. g., *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Were we able to conclude *as a matter of law* that there was probable cause to believe evidence of a crime (the wallet) was in the trunk of defendant's car and that exigent circumstances permitted the warrantless search here undertaken, we could decide that the search producing the stolen saws was lawful independently of the voluntariness of defendant's consent. See, e. g. *State v. Clark*, Me., 365 A.2d 1031 (1976). We cannot so find, however. Neither can we find the converse:—that as a matter of law there was lacking either probable cause or exigent circumstances.

Court's review of issues raised by interlocutory orders or rulings, final judgments, or both, Rule 37A M.R.Crim.P. had been in existence for more than two years. Subdivision (b) of that Rule provided: "On motion of an *aggrieved defendant*" (emphasis supplied), the Court,

> "[i]f . . . of the opinion that a question of law involved in an interlocutory order or ruling made by it . . . ought to be determined by the Law Court before any further proceedings are taken therein, . . . may, . . . report the case to the Law Court for that purpose . . . ."

It must, therefore, be taken as known by those most concerned in the legislative proceedings producing § 2115–A that, through the medium of a "report", the defendant was already authorized to have the Law Court's review of interlocutory orders or rulings independently of the review of such orders or rulings as could be had incident to defendant's appeal from a final judgment or conviction.

With this point in mind, we examine the proceedings in both the House and the Senate shortly before § 2115–A was finally enacted.

On January 9, 1968 the House had passed to be enacted a measure approved by the Judiciary Committee which conferred on both the defendant and the State a right of appeal from interlocutory orders or rulings. When this bill came before the House to be passed to be enacted,

> "[o]n motion of Mr. Richardson of Cumberland, under suspension of the rules, the House reconsidered its action of January 19 whereby the bill was passed to be engrossed." (Legislative Record, p. 371)

In this reconsideration Mr. Richardson, the sponsor of the undertaking to give to the State rights of appeal in criminal prosecutions, informed the House that because the bill which had been engrossed gave the defendant, as well as the State, the right to appeal from interlocutory orders or rulings, that bill "is not workable." Explaining, Mr. Richardson said:

> " . . . [T]he reason it is not workable is this. A defendant on trial in our courts has . . ., except for procedural limitations, an *absolutely unqualified right to review* of the entire procedure by which he was brought to trial, tried, and convicted. . . . He has full rights to *appeal* covering everything that happened to him from the time he was arrested until the time that the Foreman says: we the jury find the defendant guilty." (Legislative Record, pp. 371, 372) (emphasis supplied)

Mr. Richardson therefore urged the House to adopt an amendment to

> " . . . take out of the Judiciary Committee's bill a provision which would allow the defendant to *appeal* from . . . ." (emphasis supplied)

interlocutory orders or rulings. (Legislative Record, p. 372) Mr. Richardson's argument in support of the need for such an amendment was that if the Legislature treated the defendant the same as the State, by giving each a right to *appeal* interlocutory orders or rulings, the Legislature " . . . would set back the cause of law enforcement . . . " because there would exist a "built-in delay";

> " . . . there's an old saying in the law, that if you can get a case continued, you are half of the way home toward winning it." (Legislative Record, p. 372)

It is thus apparent that Representative Richardson conceived the *appeal right* given the State under § 2115–A—both in the form of the cross-appeal authorized for the State in the event that defendant should appeal from the final judgment of conviction as well as the appeal given the State concerning interlocutory orders or rulings—to be a full-fledged right of appeal "absolute" in the sense that the State could resort to it without necessity to have prior judicial approval. Obviously, had Mr. Richardson thought to the contrary—that is, that the right of appeal being given the State as to interlocutory orders was susceptible of being treated as merely an interlocutory "report" capable of being utilized only upon prior judicial approval,—there was no occasion for him to be distressed, as

he plainly was, about a "set back [to] the cause of law enforcement." First, were the State being given only the opportunity for an interlocutory report, affording this to defendants would merely reaffirm what defendants already enjoyed. Second, realistically, there would be no delay "built-in" resulting from the tactics of defense lawyers since they could act only after prior judicial approval.

It is manifest, therefore, that Mr. Richardson conceived the right of interlocutory appeal granted the State as "absolute" in the same sense that defendant's right to appeal from a final judgment of conviction is "absolute":—it may be resorted to without need for prior judicial approval. Precisely because he opposed such "absolute" right of interlocutory appeal for defendants, Mr. Richardson spoke as he did.

After Mr. Richardson's comments, the House of Representatives, on January 24, 1968, adopted the amendment denying to defendants the right of *appeal* conferred upon the State as to interlocutory rulings or orders. (Legislative Record, p. 373)

As thus amended by the House, the measure conferring rights of appeal on the State was shortly thereafter passed to be engrossed by the Senate. Then, on January 25, 1968, Senator Mills of Franklin moved that the Senate reconsider its action. (Legislative Record, p. 478) The ensuing Senate debate reveals most clearly that the Senators who had knowledge of the matters involved shared Representative Richardson's conception of the nature of the right of appeal being conferred on the State.

Speaking of the amendment made by the House, Senator Harding of Aroostook stated:

"This matter slipped through and it did not come to my attention at the time when apparently an inconsistent action by the House had been taken . . . ."

Senator Harding thereupon opposed the House amendment, arguing:

"If a judge were to rule in a defendant's favor, his ruling could go to the Law Court [under the right of appeal to be given the State] and he could be over-turned, but he could rule against the defendant as often as he wanted to and this would not go to the Supreme Court. Some will say eventually it would get there . . . [by reason of the defendant's right of appeal from the final judgment of conviction]. But that is not the point. The defendant should be granted the same rights as the State . . . ." (Legislative Record, p. 479)

These comments by Senator Harding would be pointless were Senator Harding conceiving the right of appeal given the State as to interlocutory rulings or orders as no more than an opportunity for an interlocutory report. Defendants already enjoyed opportunity for an interlocutory report by virtue of Rule 37A(b); hence, if only an interlocutory report opportunity was being given to the State, defendants and the State were on a par, and Mr. Harding was wasting his breath by pleading that defendant be given parity.

Here again, then, the plain fact is that, like Representative Richardson, Senator Harding conceived the right being given the State to appeal from interlocutory rulings or orders to be as "absolute" as the defendant's right to appeal from a final judgment of conviction. As a defendant may resort to the appeal from a final judgment of conviction without need for prior judicial approval, so the State may resort to its appeal from an interlocutory ruling or order in its own "absolute" discretion (as manifested in each particular case by the State's highest prosecuting official, the Attorney General), without need to procure prior judicial approval.

The remarks of Senator Hildreth of Cumberland show that he had the same conception. (Legislative Record, p. 479)

Then, Senator Mills entered the debate to refute a claim made by Senator Hildreth that to give the State an "absolute" right of appeal from interlocutory rulings merely put the State in equivalent position with a defendant who had an "absolute" right to appeal from a final judgment of conviction. Senator Mills made the point:

" . . . [G]reat inequality would exist in that the *only appeal* that the defendant has is after the whole thing has been gone through to final conviction, . . then, after the expense of a long trial possibly he might get a reversal on that error, whereas the State is given this shortcut on a question in the very preliminary proceedings. . . . [T]he State is given a right which is not accorded the defendant . . . ." (Legislative Record, p. 480)

These comments by Senator Mills show that he, too, was thinking of the right of interlocutory appeal being conferred on the State as a right to which the State could resort in the same "absolute" sense that a defendant could resort to the right to appeal from a final judgment of conviction; no prior judicial approval was necessary (as would be the case if the State was being given only the opportunity for an interlocutory report). Were Senator Mills to have believed otherwise—i. e., that the State's right of appeal from interlocutory rulings or orders would be treated as no more than an interlocutory report—then the State was being given only what was already available to defendants, and it made no sense for Senator Mills to be complaining that

"the State is given a right which is not accorded the defendant."

Indeed, precisely because Senators Harding, Hildreth and Mills had made it plain that the State was being given an "absolute" right of interlocutory appeal, and Senator Harding and Mills wanted this same "absolute" right of interlocutory right of appeal to be given to defendant—as distinguished from the interlocutory report, subject to judicial authorization, already available to defendant,—Senator McLeod of Penobscot complained that to give such an "absolute" interlocutory right of appeal to the defendant would be irresponsible. Senator McLeod's argument was that at least the State could exercise its "absolute" right of interlocutory right of appeal only upon "the written approval of the Attorney General", and this, in Senator McLeod's view, was a sufficient guarantee of a responsible exercise of such right by the State. On the

other hand, echoing the sentiments of Representative Richardson, Senator McLeod protested that to give an "absolute" right of interlocutory appeal to the defendant would place discretion solely in the hands of the "defense attorney" who could achieve delay by taking

"spurious, silly or stupid [interlocutory] motions . . . right to the Law Court." (Legislative Record, p. 480)

Replying to Senator McLeod, and in further support of his own position that defendants should be given such "absolute" right to an interlocutory appeal as was being contemplated for the State, Senator Harding sought to reassure the Senate that defense attorneys could be trusted to act responsibly. He said:

" . . . I would advise my good friend that attorneys do not make spurious or nonsensical motions which are going to be carried to the Supreme Court of the State of Maine. . . . [W]e are governed by certain ethics and pride in our practice. While this might occur on rare occasions, I can assure the members of the Senate that it would be rare, rare indeed." (Legislative Record, p. 480)

The crucial point which emerges from the above distillation of the House and Senate thinking leading to the enactment of § 2115–A is that the Legislature created a substantive right of interlocutory appeal in the State as "absolute" in its essence, upon the written approval of the Attorney General, as is the defendant's right to appeal from a final judgment of conviction; no prior judicial approval is to operate as an additional control upon the State.