STATE of Maine

v.

ANN MARIE C.

Supreme Judicial Court of Maine.

Oct. 29, 1979.

Michael D. Seitzinger (orally), Asst. Atty. Gen., Augusta, John R. Atwood, Dist. Atty., Barbara Raimondi, Law Student, Rockland, for plaintiff.

Sulides & Fletcher by Steven C. Fletcher (orally), Rockland, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, GODFREY, NICHOLS and GLASSMAN, JJ.

McKUSICK, Chief Justice.

Following a juvenile adjudicatory hearing on November 16, 1978, the District Court in Rockland, sitting as the juvenile court, found defendant guilty of five bomb threats to the local high school. Pursuant to 15 M.R.S.A. § 3402 (Supp.1965–78), defendant took a timely appeal to the Superior Court (Knox County). The Superior Court justice sustained her appeal and remanded the cases for a new hearing in the juvenile court, on the ground that two confessions were improperly admitted into evidence. The State has appealed the Superior Court decision to this court.

I

*Law Court Jurisdiction over the State's Appeal*

At oral argument this court on its own initiative raised the question whether under the Juvenile Code [1] the State had any right to appeal the Superior Court's order sustaining defendant's appeal from the juvenile court. Upon our reading of the controlling appeal provisions of the Juvenile Code, 15 M.R.S.A. §§ 3401–07 (Supp.1965–78),[2] we hold that the Law Court has jurisdiction to hear this appeal by the State.

Appeals in juvenile matters are radically different in nature from appeals in adult criminal cases first tried in the District Court. The juvenile court (the name that the Juvenile Code [3] gives to the District Court) is the one and only trial court in the juvenile justice system. Appeals to the Superior Court are not for trial *de novo*; the review is only for errors of law or abuse of discretion.[4] In juvenile matters, as in civil cases first tried in the District Court, *cf.* D.C.Civ.R. 73(a), the Superior Court is merely an intermediate appellate court. The Juvenile Code expressly provides that the "District Court *civil* rules shall apply to appeals to the Superior Court under this chapter, except where inconsistent with the provisions of this chapter." (Emphasis added) 15 M.R.S.A. § 3401(4).

Against that background we read chapter 509 of the Juvenile Code, entitled "Appeals", to say that either party who loses in the Superior Court on questions of law has a right of appeal to the Law Court. Section 3401 in subsection (1) declares without limitation that:

A. Judgments of the juvenile court in juvenile matters shall be reviewable by the Superior Court.

B. Judgments of the Superior Court in juvenile matters shall be reviewable by the Law Court.

1. The Juvenile Code, 15 M.R.S.A. pt. 6, §§ 3001–3508 (Supp.1965–78), was enacted by P.L.1977, ch. 520, § 1 effective July 1, 1978.

2. The appeal provisions of the Juvenile Code, 15 M.R.S.A. ch. 509, §§ 3401–07 (Supp.1965–78), that became effective on July 1, 1978, and are applicable to this case, were repealed and replaced by P.L.1979, ch. 512, §§ 8–14, effective September 14, 1979. Except where specified otherwise, reference hereafter in this opinion to any of those appeal provisions will be to their pre-September 14, 1979, form.

3. 15 M.R.S.A. § 3101(1).

4. 15 M.R.S.A. § 3406. Section 3401(3) of the Juvenile Code declares that there is no right to a jury trial in juvenile matters. *See also State v. Gleason*, Me., 404 A.2d 573, 583–85 (1979).

As if to reinforce the comprehensiveness of the declaration in subsection (1) of reviewability of *any* Superior Court judgment in a juvenile matter, subsection (2) of the same section 3401 articulates specifically "the goals of the juvenile appellate structure" to be:

A. To correct errors in the application and interpretation of law;

B. To insure substantial uniformity of treatment of persons in like situations;

C. To provide for review of juvenile court decisions so that the legislatively defined purposes of the juvenile justice system as a whole are realized.

If on appeal a single Superior Court justice errs in applying or interpreting the law, and as a consequence reverses an adjudication of the juvenile court, that error can be corrected (to achieve the first goal) and substantial uniformity of treatment in like situations can be insured (to achieve the second goal) only by Law Court review—at the instance of the State.

Section 3402, the second section of chapter 509, relates to appeals from the juvenile court to the Superior Court. Here the legislature showed that it recognized the breadth of its grant of appellate jurisdiction to the Superior Court in section 3401(1)(A) and also showed that it knew how to limit that broad grant of reviewability when it wanted to do so. By legislative direction only final orders are reviewable by the Superior Court, 15 M.R.S.A. § 3402(1), and the State is permitted to appeal from the juvenile court (*i. e.*, the trial court) only on certain specified types of juvenile court orders, 15 M.R.S.A. § 3402(3).[5]

Turning now to appeals to the Law Court, we find nowhere in the other five sections of chapter 509 any comparable limitation on the broad declaration in section 3401(1)(B) that any "[j]udgments of the Su-

perior Court in juvenile matters shall be reviewable by the Law Court." For several reasons, we do not believe the legislature intended that a restriction on the State's right to invoke Law Court review in juvenile matters should be divined from the purely procedural provisions of section 3407, reading:

Appeals, for the purpose only of raising questions of law, from decisions of the Superior Court rendered in juvenile cases before the Superior Court on appeal from orders of juvenile courts, may be taken to the Law Court in the same manner and form as appeals in adult criminal actions.

First, the phrase "in the same manner and form as appeals in adult criminal actions" would ordinarily be read simply to refer to Rules 37 through 39E of the Maine Rules of Criminal Procedure, regulating the form, and the time and place of filing, of the notice of appeal, the requirements of the record on appeal, and other procedural matters. If the legislature had intended to restrict its earlier broad grant of reviewability of Superior Court judgments in juvenile matters, it would have used language such as "only to the same extent and in the same manner as in adult criminal actions."[6] Note that section 3407 does not expressly address the question who may appeal, any more than does the broad grant of reviewability contained in section 3401(1)(B).

Second, earlier in the appeals chapter of the Juvenile Code the legislature used the identical phrase, "in the same manner and form as in appeals from the Superior Court in criminal cases." 15 M.R.S.A. § 3402(6). The context of that earlier use of the same phrase shows beyond any doubt that it has reference only to procedural matters, *i. e.*, the manner and form of delivering the record on appeal as prescribed by Rule 39 of the Maine Rules of Criminal Procedure.

---

5. The State is by 15 M.R.S.A. § 3402(3)(C) expressly authorized to appeal "[a]ny order which deprives the prosecution of evidence." Although that provision apparently refers to an appeal from the juvenile court to the Superior Court, and not to an appeal from a Superior Court order that in sustaining the juvenile's appeal from the juvenile court "de-

prives the prosecution of evidence" on retrial, failure to construe the other provisions of the appeals chapter in a way to give the State the right of appeal *from* the Superior Court would produce an anomalous inconsistency.

6. Compare language used in P.L.1979, ch. 512, § 14.

Third, to read the language "in the same manner and form as appeals in adult criminal actions" to put a *substantive* limitation on the State's right to appeal to the Law Court from a decision of the intermediate appellate court, proves too much. Such a reading means that the Law Court could *never*, on the State's appeal, review a Superior Court decision in a juvenile matter. In adult criminal actions the State has only very limited rights of independent appeal from certain prescribed pretrial orders of the Superior Court and even then may appeal only "before the defendant has been placed in jeopardy under established rules of law." 15 M.R.S.A. § 2115–A (Supp.1965–78), repealed and replaced by P.L.1979, ch. 343, § 2. So far as appeals from the Superior Court in criminal cases are concerned, section 2115–A permits the State to appeal only pretrial orders such as one "suppressing evidence prior to trial." *Id.* The Superior Court's judgment on appeal in a juvenile matter, even if it were an affirmance of one of the juvenile court's orders that the State may appeal under section 3402(3), is hardly a *Superior Court* order "suppressing evidence prior to trial." Section 2115–A contemplates that District Court suppression orders will be appealable directly to the Law Court, and only to the Law Court. In "adult criminal actions" the State has no right of appeal *at all* after trial except in reaction to and in connection with an appeal by the defendant from the Superior Court to the Law Court. 15 M.R.S.A. § 2115–A(2).

It appears most improbable that the legislature meant the procedural language "in the same manner and form" to restrict the otherwise unrestricted grant of power to the Law Court by the first section of chapter 509: "Judgments of the Superior Court in juvenile matters shall be reviewable by the Law Court." To impose such a heavy task upon those few words, "in the same manner and form," would be to legislate by obscure indirection in the midst of an elaborate and detailed code. We do not find such an interpretation of the appeals chapter consistent with the legislature's evident attempt to elucidate the applicable juvenile law in detail and its instruction to us that the Juvenile Code should be liberally construed to carry out its purposes.

Our decisions in *State v. Kelly*, Me., 376 A.2d 840 (1977), and *State v. Fernald*, Me., 381 A.2d 282 (1978), do not require us to read the Juvenile Code's appeal provisions in any way different from that to which we are led by a careful reading. Both cases involved adult criminal appeals taken by the State from the Superior Court prior to trial; not appeals from an intermediate appellate court's decision in a civil-type appeal from the District Court sitting as the juvenile court. *Kelly* refused to find a State's right of appeal in the catch-all catalogue of 4 M.R.S.A. § 57 listing the branches of the Law Court's jurisdiction, including "cases on appeal" and "questions of law arising on reports of cases." However, the *Kelly* court did find jurisdiction to hear the State's appeal in a specifically applicable statute, and we find the Juvenile Code's appeal provisions serve precisely the same function. While statutes granting the State the right to appeal in an adult criminal action are to be closely scrutinized because a State appeal from the trial court is "so serious and far-reaching an innovation in the criminal jurisprudence of the United States," quoted in *Kelly*, 376 A.2d at 843, a Juvenile Code provision for a State appeal to a higher appellate court, after the juvenile defendant's successful appeal to the intermediate appellate court, does not deserve the same suspicion. The Superior Court's review of the juvenile court's adjudication is by statute conducted in the same manner as its review of a District Court judgment in a civil action, 15 M.R.S.A. § 3401(4). Recently, in *State v. Gleason, supra* at 580, we eschewed a "wooden approach, characterizing the Juvenile Court proceeding as 'civil' or 'criminal'," but at the same time we did hold that juvenile proceedings are something different from criminal prosecutions, such as were involved in *Kelly* and *Fernald.* "Our Code creates a separate and distinctive juvenile justice system designed primarily for the rehabilitation, not the punishment, of the young offender." *Id.* at

582. The strict-scrutiny test applied by *Kelly* and *Fernald* to State appeal statutes in criminal cases is inappropriate to the "separate and distinctive juvenile justice system." Furthermore, even in "adult criminal actions," jurisdictions having two levels of appellate courts nearly universally allow the prosecution to appeal to the highest court from an adverse decision by the intermediate appellate court. *See, e. g.,* N.Y.Crim.Proc.Law § 450.90(1) (McKinney); N.C.Gen.Stat. § 7A–30(2); Ohio Rev.Code § 2953.14. There is, of course, no double jeopardy problem. *See State v. Marathon Oil Co.,* 528 P.2d 293, 295–96 (Alaska 1974). For both reasons, the appeal by the State from the Superior Court to the Law Court in juvenile matters is *not* the "serious and far-reaching . . . innovation in the criminal jurisprudence of the United States" that impelled the *Kelly* and *Fernald* courts to apply the close-scrutiny test.

In any event, even if the close-scrutiny test of *Kelly* and *Fernald* were applied to the appeal provisions of the Juvenile Code, we would find the State has a right of appeal from the Superior Court to the Law Court in juvenile matters. As we have earlier explained, our reading of the Juvenile Code provisions specifically addressed to appeals from the intermediate appellate court to the highest court of our state leads us to conclude that the legislature has authorized us to entertain the State's appeal.

In conclusion, we note that confirmation for our interpretation of the appeals chapter of the Juvenile Code in effect from July 1, 1978, to September 14, 1979, may be drawn from the legislative enactments in effect both before and after that period. In our view the State has at all times—at least since 1959—had the right to appeal from the Superior Court to the Law Court in juvenile matters. The pre-Code juvenile statute enacted in 1959 expressly declared that the "hearing on appeal, in the Superior Court [from the juvenile court] shall not be criminal in nature" and that "[a]ppeals, for the purpose only of raising questions of law, from decisions of the Superior Court [in

juvenile appeals from the juvenile court] may be taken to . . . the law court in manner and form as appeals in cases in equity." R.S.1954, ch. 152–A, §§ 22, 25, as enacted by P.L.1959, ch. 342, § 1. Any aggrieved party could appeal to the Law Court in an equity case. *See Perkins v. Kavanaugh,* 135 Me. 344, 345–46, 196 A. 645, 646 (1938). In light of the accepted view in 1959 that juvenile proceedings "remain[ed] civil in character," *see Shone v. State,* Me., 237 A.2d 412, 417 (1968), we do not hesitate in finding that the legislature intended the State, prior to July 1, 1978, to be able to appeal to the Law Court to the same extent as any other aggrieved party in a civil action.

The legislature has now declared with perfect clarity its policy judgment that the State should be able to appeal to the Law Court from adverse Superior Court decisions in juvenile cases. In revising the appeal provisions of the Juvenile Code, P.L. 1979, ch. 512, §§ 8–12, effective September 14, 1979,[7] the legislature provided that decisions "of the Superior Court on appeal from the juvenile court . . . may be appealed to the Law Court by an aggrieved party," *id.* at § 14. The legislature has for future cases resolved the jurisdictional issue of this appeal. Although those revisions came too late to be directly applicable here, we construe them, to the extent here relevant, to be intended as a clarification, not a substantive change, of the original provisions of the Code. The "Statement of Facts" appended to L.D.1661, which on enactment became P.L.1979, ch. 512, recited:

> Except as noted below [not here relevant], most of the amendments are largely technical and none are intended to make any major policy changes in either the Maine Juvenile or the Maine Criminal Code.

In sum, we find no reason not to read literally the broad legislative grant that "[j]udgments of the Superior Court in juvenile matters shall be reviewable by the Law Court." 15 M.R.S.A. § 3401(1)(B). On the

---

7. See n. 2 above.

contrary, ample confirmation for that reading comes from the Juvenile Code context of that broad language and from prior and subsequent legislative enactments. Accordingly, we will proceed to consider the merits of the State's appeal.

## II

### Merits of the State's Appeal

On November 1 and November 6, 1978, three juvenile petitions were filed in the District Court charging the sixteen-year-old female defendant with five counts of terrorizing under section 210 of the Criminal Code.[8] The petitions alleged that defendant had communicated five bomb threats to the Rockland District High School successively on October 13, 19, 23, 24, and 30, 1978. The counts relating to the first four dates alleged that the natural and probable consequences of the bomb threats was the evacuation of the high school, and thus charged what would be Class C crimes if committed by an adult. The final count alleged that the natural and probable consequence of the October 30 threat was to place a high school employee in reasonable fear that the crime would be committed, and thus charged what would be a Class D offense had defendant been an adult.

The primary issue in this case is the admissibility of certain inculpatory statements made to the police by defendant on October 24 and October 30, 1978. The first confession related to the bomb threats of October 13, 19, 23, and 24; the second to that of October 30.

The circumstances under which defendant made the first confession were the following: At about 10:15 a. m. on October 24, Rockland police officer Snow stopped an automobile in which defendant was a passenger and asked the four occupants, all of high school age, to accompany him to the police station. At the station the officer questioned defendant and her three male companions separately, each for some 20 to 30 minutes. Each was instructed to remain in the car until called for questioning and, following interrogation, to sit in another room until all four had been questioned. Before questioning defendant, officer Snow gave her the *Miranda* warnings and asked her whether she wanted him to contact her mother, who was in Jonesport, some 150 miles away. Defendant indicated that she understood her rights and would answer questions without having an attorney present, and she asked Snow not to contact her mother. In the ensuing questioning, which ended sometime between 11:15 and 11:30 a. m., defendant denied any involvement in the bomb threats. Defendant was recalled about noon. Upon further questioning by Snow, who did not restate the *Miranda* warnings, defendant admitted making the bomb threats of October 13, 19, 23, and 24. In an attempt to ascertain whether he should proceed in the absence of defendant's mother, Snow made several telephone calls, finally being advised by a juvenile intake worker that the parent's permission was not a prerequisite to questioning so long as the juvenile could appreciate the meaning of the *Miranda* warnings. In the course of further questioning, Snow was joined by fellow officer Lyons, the *Miranda* warnings were twice repeated, and, with her permission, defendant's confession to the four bomb threats was recorded on tape at about 1:00 p. m. She was then released on her own recognizance.

The circumstances of the confession on October 30 were as follows: At about 10:40 that morning, the high school received another bomb threat. The telephone call was

8. 17–A M.R.S.A. § 210 (Supp.1978) provides:
 1. A person is guilty of terrorizing if he communicates to any person a threat to commit or to cause to be committed a crime of violence dangerous to human life, against the person to whom the communication is made or another, and the natural and probable consequence of such a threat, whether or not such consequence on fact occurs, is:

 A. To place the person to whom the threat is communicated or the person threatened in reasonable fear that the crime will be committed; or
 B. To cause evacuation of a building, place of assembly or facility of public transport.
 2. Violation of subsection 1, paragraph A, is a Class D crime. Violation of subsection 1, paragraph B, is a Class C crime.

traced to a Rockland motel. It was impossible to trace the call to a particular room, but the police had earlier learned that a room in the motel was registered to defendant. Using a passkey, the motel manager admitted police into defendant's unoccupied room, ostensibly to determine whether a connection still existed between the room phone and the high school phone. On checking the room phone, the officers heard only a dial tone. A few minutes later, defendant arrived at the room and, in response to an inquiry, admitted that she had used the room phone at 10:40 a. m. She was then taken to the police station and given the *Miranda* warnings. The police made no attempt to contact defendant's mother. Defendant stated that she understood her rights and agreed to talk to police without an attorney present. Questioned for 20 to 30 minutes in the presence of several police officers and the intake worker, defendant admitted making the bomb threat that morning and was then placed under arrest.

At the subsequent juvenile adjudicatory hearing held on all five charges, the State offered the October 24 and 30 confessions in evidence. Over defendant's objection, the juvenile court admitted the tape of the October 24 confession into evidence, finding that the police had probable cause to detain defendant, that defendant had knowingly and intelligently waived her *Miranda* rights and her alleged right to have a parent present, and that the confession was voluntary.

Defendant objected to the admission of the October 30 confession on the grounds that her statement was the product of an unlawful entry by the police into her motel room and that she had no parent or adult friend present at the time of the *Miranda* waiver. Overruling that objection, the juvenile court ruled alternatively that the motel manager had a right of entry to test the telephone line or that the exigent circumstances of testing the line excused the warrant requirement. The juvenile court also determined that the absence of the parent was not critical, especially in view of the presence of the juvenile intake worker at

the interrogation on October 30. At the close of all the evidence, the court adjudged defendant guilty of the five juvenile crimes and ordered her committed to the Maine Youth Center for an indeterminate period.

Reversing the adjudication of guilt on all five crimes, the Superior Court justice ruled that each confession was the product of an illegal arrest and, as an alternative ground, that a valid waiver of *Miranda* by a juvenile requires the presence of a parent or other adult interested in the juvenile's welfare. The remand of the cases has been stayed and defendant released on bail, pending the outcome of the State's appeal to the Law Court.

Before this court, the State argues that the challenged confessions were not secured by exploitation of illegal arrests and that a valid waiver of *Miranda* rights by a juvenile does not *per se* require prior consultation with a parent or other adult interested in the juvenile's welfare. Because the Superior Court order was premised on those alternative grounds, the State recognizes that the suppression of each confession must be upheld unless this court holds that the Superior Court justice erred on both grounds.

A. *The Appropriate Standard of Review*

■ On this appeal we attach no presumptive validity to the Superior Court order. As discussed above, in a juvenile appeal the Superior Court functions as an intermediate appellate court. "Where [as here] there is a record below, the appeal shall be on the record only and shall be on matters of law." 15 M.R.S.A. § 3401(1)(C) (Supp.1965–78). This court is therefore in as good a position as was the Superior Court justice to review the record and to determine whether the juvenile court erred in receiving the confessions in evidence. *Cf. Weeks v. State*, Me., 267 A.2d 641, 648 (1970). Although deference is properly accorded the juvenile court's finding of any historical facts, this court will independently review the legal conclusions drawn from those facts. *Cf. State v. Cefalo*, Me., 396 A.2d 233, 239–40 (1979). In addition, the

other claims of error raised and preserved by defendant at the intermediate appellate level, although not reached by the Superior Court, are nevertheless properly presented to this court.

**B.** *The October 24 Confession*

■ In *State v. Turner,* Me., 394 A.2d 798, 799–800 (1978), this court adopted the test established by the United States Supreme Court in *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), to determine under what circumstances the interests protected by the Fourth Amendment require the suppression of inculpatory statements made to police officers following an arrest without probable cause. On a case-by-case basis, a court must consider "(1) the voluntariness of the statement (a threshold requirement); (2) the giving of *Miranda* warnings; (3) the temporal proximity of the arrest and confession; (4) the presence of intervening circumstances; [and,] (5) particularly, the purpose and flagrancy of the official misconduct." [9] *State v. Turner, supra* at 800.

At oral argument, the State conceded that under the recent pronouncement of the Supreme Court in *Dunaway v. New York,* —— U.S. ——, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the October 24 detention was sufficiently intrusive as to constitute an arrest for constitutional purposes, that officer Snow lacked probable cause to detain defendant, and that the confession must therefore be suppressed. On facts very similar to the instant case, the Supreme Court in *Dunaway* refused to extend the "reasonable suspicion" standard of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to investigatory seizures, rejected a balancing test of intrusiveness vis-à-vis justification, and held that such seizures require probable cause. *Id.,* —— U.S. at ——–——, 99 S.Ct. at 2253–2258, 60 L.Ed.2d at 832–38. Applying the *Brown* analysis, the *Dunaway* Court ruled that an arrest for an investigatory purpose without probable cause constituted sufficient purposeful police misconduct to warrant invocation of the exclusionary rule. *Id.* at —— ––——, 99 S.Ct. at 2259–2260, 60 L.Ed.2d at 839–40.

The Superior Court must be affirmed in reversing the adjudications for the first four bomb threats.

**C.** *The October 30 Confession*

**1.** *Possible Taint by the October 24 Arrest*

■ In holding that the October 30 confession should have been suppressed as the fruit of an illegal arrest, the Superior Court failed to specify whether the arrest it found unlawful was that occurring on October 30 or that on October 24.

Although requiring the exclusion of the October 24 confession, the illegality of the arrest on that date does not warrant the suppression also of the confession on October 30. As to the latter confession, the *Brown* "temporal proximity" and "intervening circumstances" factors weigh heavily in favor of dissipation. Any causal connection between the arrest on October 24 and the confession of defendant to a separate crime six days later is sufficiently attenuated both by the length of time between the events and by the intervening facts of another bomb threat by defendant, who had been released on her own recognizance, followed by another arrest, the recitation of *Miranda* warnings, and defendant's waiver of her rights. *Cf. Wong Sun v. United States,* 371 U.S. 471, 491, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Therefore, the issue whether the Fourth Amendment requires the exclusion from evidence of the October 30 confession must be determined solely by reference to the legality of police conduct on October 30.

---

**9.** Although not material to the instant case, the "*Miranda* compliance" factor of the *Brown* analysis was characterized by the *Dunaway* Court as relevant to the Fifth Amendment threshold issue of voluntariness rather than to the Fourth Amendment question of attenuation. *See Dunaway v. New York,* —— U.S. ——, ——– ——, 99 S.Ct. 2248, 2258–2259, 60 L.Ed.2d 824, 838–39 (1979).

## 2. *Legality of the October 30 Arrest*

█ It is clear under *Dunaway, supra,* —— U.S. at ——, 99 S.Ct. at 2258, 60 L.Ed.2d at 838, that an arrest for constitutional purposes occurred on October 30 when the police transported defendant to the stationhouse for questioning. The juvenile court made no express finding that the police had probable cause to make that arrest, other than commenting that defendant was a prime suspect at the time. Nevertheless, we are satisfied from a review of the record that the police, at the time of their entry into the motel room, had probable cause to arrest defendant for the bomb threat received earlier that morning. As this court has repeatedly stated:

> Probable cause exists where facts and circumstances within the knowledge of the officers and of which they had reasonably trustworthy information would warrant a prudent and cautious person to believe that the arrestee did commit or is committing the felonious offense.[10]

*State v. Parkinson,* Me., 389 A.2d 1, 8 (1978). *See also State v. LeBlanc,* Me., 347 A.2d 590, 593–94 (1975); *State v. Smith,* Me., 277 A.2d 481, 488 (1971).

█ Although defendant's admission in the motel room that she was using the telephone at the time of the threat cannot supply probable cause to arrest if the police entry were unlawful, *State v. LeBlanc, supra* at 594, the police at the time of entry knew that the telephoned threat had been traced to the motel, that defendant was registered there, and that six days earlier defendant had confessed to four previous bomb threats to the same school, all of which had occurred at approximately the same time of day. Moreover, it would be an unwarranted extension of the Fourth Amendment exclusionary rule to hold that the October 24 confession, tainted only as

the product of an unlawful seizure (and accordingly inadmissible as substantive evidence), was also unavailing to the police in establishing probable cause to believe that defendant had later committed a separate and distinct crime. The unlawful seizure on October 24 was not directed at gathering facts for use in investigations of crimes not yet committed. Here the function of the exclusionary rule is to deter unlawful police conduct rather than to insulate the accused from investigation and prosecution for subsequent, discrete criminal activity. Any incremental deterrent effect on errant police behavior engendered by such a mechanical application of the rule would come at the cost of a substantial impairment to the criminal investigatory process. *Cf. United States v. Ceccolini,* 435 U.S. 268, 276–80, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *Michigan v. Tucker,* 417 U.S. 433, 450–51, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). *But cf. Commonwealth v. White,* —— Mass. ——, 77 Mass.Adv.Sh. 2805, 371 N.E.2d 777, 781 (1977), *aff'd by equally divided court,* 439 U.S. 280, 99 S.Ct. 712, 58 L.Ed.2d 519 (1978). Defendant argues, on the basis of *State v. Walker,* Me., 341 A.2d 700, 704 (1975), that defendant's past criminal conduct, even in conjunction with the slight facts connecting defendant with the October 30 threat, cannot constitute probable cause for arrest. The *Walker* court went on to point out, however, that probable cause may exist where, as here, "the 'criminal record' links defendant with reasonable specificity to the criminal conduct forming the basis for police inquiry." *Id.*

Because probable cause justified the warrantless arrest of defendant, her subsequent confession was not inadmissible as "fruit of the poisonous tree" unless the confession was obtained by exploitation of a prior illegal entry by the police into defendant's motel room.

---

**10.** Defendant asserts that even if the police had probable cause to arrest her on October 30, the warrantless arrest was nonetheless unlawful because defendant was later charged with a Class D crime and 17–A M.R.S.A. § 15 requires that warrantless arrests for Class D offenses be committed in the presence of the arresting officer. *Id.*; *cf. State v. Clark,* Me., 365 A.2d 1031,

1034 (1976). That argument would be persuasive only if the police lacked probable cause to believe that defendant committed the Class C crime of terrorizing. The facts known to the police were sufficient to justify an arrest for the Class C offense; the conduct of defendant could have supported either charge. *See* 17–A M.R.S.A. § 210.

3. *Legality of the Entry into the Motel Room*

■ The juvenile court ruled that the entry by the police into defendant's motel room was lawful because exigent circumstances excused the warrant requirement and, presumably, because the police had probable cause to search the room. *See State v. Walker, supra* at 703. Nevertheless, we need not determine whether the court's ruling was clearly erroneous, *see State v. Carter*, Me., 391 A.2d 344, 346 (1978), because no causal nexus exists between the entry and the subsequent confession. The inculpatory statement did not result from the fact of entry or from any information discovered because of the entry. Rather, defendant's confession followed an arrest based on facts that constituted probable cause and that were known to the police when they entered the motel room. That the entry preceded the arrest is fortuitous. Therefore, even if the entry were unlawful, the confession was not obtained by exploitation of the entry. Consequently, the fruit-of-the-poisonous-tree doctrine is inapplicable.[11]

D. *Necessity of Parental Consultation for Valid Miranda Waiver*

■ In ruling both confessions inadmissible, the Superior Court justice advanced as an independent ground that "the failure of the police to notify some adult interested in the Defendant's welfare before proceeding with her interrogation renders the purported waiver [of her *Miranda* rights] automatically invalid." This conclusion by the Superior Court justice is not compelled by the federal Constitution. In rejecting the application of *per se* rules to the question whether a juvenile has effectively waived the rights delineated in *Miranda*, the United States Supreme Court has recently held that the totality-of-the-circumstances test, apposite to the issue of waiver by an adult, applies as well to the determination of waiver by a juvenile. In *Fare v. Michael*

*C.,* —— U.S. ——, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), the Court stated:

This totality of the circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Id.,* at ——, 99 S.Ct. at 2572, 61 L.Ed.2d at 212. The *Fare* decision therefore approves the view of the majority of jurisdictions that eschew a *per se* rule of incompetency and consider the absence of a parent or interested adult during the interrogation of a juvenile as merely a factor in the totality of circumstances to be taken into account in making the waiver determination. *See, e. g., State v. Oliver*, 160 Conn. 85, 273 A.2d 867, 871, *cert. denied*, 402 U.S. 946, 91 S.Ct. 1637, 29 L.Ed.2d 115 (1970); *People v. Riley*, 49 Ill.App.3d 304, 364 N.E.2d 306, 309 (1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1657, 56 L.Ed.2d 91 (1978). Prior to *Fare*, the courts of Pennsylvania, Indiana, and Georgia had adopted as a matter of federal constitutional law the rule that a juvenile is *per se* incompetent to make a knowing and voluntary waiver absent the presence of, or prior consultation with, a parent or other adult interested in the juvenile's welfare. *Commonwealth v. Smith*, 472 Pa. 492, 372 A.2d 797, 799–800 (1977); *Lewis v. State*, 259 Ind. 431, 288 N.E.2d 138, 142 (1972); *Freeman v. Wilcox*, 119 Ga.App. 325, 167 S.E.2d 163, 166–67 (1969), overruled *Riley v. State*, 237 Ga. 124, 226 S.E.2d 922, 926 (1976). Louisiana reached the same result

---

11. At the juvenile hearing, defendant did not challenge the voluntariness of the October 30 confession. Rather, she asserted that her waiv-

er was ineffective because her mother was not present. Consequently, the juvenile court did not make a specific finding of voluntariness.

on state constitutional grounds. *In re Dino,* 359 So.2d 586, 593–94 (La.), *cert. denied sub nom. Louisiana v. Dino,* 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978).

We read the *Fare* decision as foreclosing the argument that the federal Constitution imposes upon law enforcement officials a *per se* requirement that a juvenile be accorded the counsel of a parent or other adult before she can knowingly and voluntarily waive her *Miranda* rights. We also decline defendant's invitation that we adopt this rigid restraint as a matter of state constitutional law, *cf. State v. Melvin,* Me., 390 A.2d 1024, 1032 n. 4 (1978); *State v. Foisy,* Me., 384 A.2d 42, 44 n. 2 (1978), or as an appropriate sanction for violation of the statutory notification requirement, 15 M.R.S.A. § 3203(2).[12] The history of the Juvenile Code reveals a legislative rejection of any such *per se* exclusionary rule.[13] The totality-of-the-circumstances test is an adequate standard by which to measure the waiver of *Miranda* rights by a juvenile. Breach of a statutory duty of notification, although an important factor in assessing whether a juvenile has effectively waived his *Miranda* rights, will not be given dispositive weight. *See State v. Raiford,* 7 Or. App. 202, 209–10, 488 P.2d 295, 490 P.2d 206, 208 (1971); *Theriault v. State,* 66 Wis.2d 33, 223 N.W.2d 850, 857–58 (1974).

### E. *Sufficiency of the Evidence*

In her appeal to the Superior Court, defendant argued that the juvenile court improperly denied her motion for acquittal on the grounds that the State failed to establish, as required by the statute, that evacuation of the school building was the natural and probable consequence of the October 13, 19, 23, and 24 threats because of a mandatory evacuation policy in force on those dates or that the natural and probable consequence of the October 30 threat was to place the school secretary in reasonable fear that a crime would be committed because the secretary was not in fact placed in fear.

 Both of these arguments lack merit. That the school board should adopt for a period of time a policy requiring evacuation only underscores that the danger to human life created by a bomb threat to a public building usually requires evacuation. Similarly, it is immaterial whether and to what degree the October 30 threat engendered actual fear in the school secretary if under the circumstances the threat was sufficient to create reasonable apprehension in an ordinary hearer. *State v. Porter,* Me., 384 A.2d 429, 434 (1978); *cf. State v. Lizotte,* Me., 256 A.2d 439, 442 (1969). Defendant's motion for acquittal was based upon erroneous views of the law, and the juvenile court correctly decided it. The evidence admitted at the hearing was sufficient to support beyond a reasonable doubt the adjudication of guilty as to all five juvenile crimes charged. Therefore, the adjudication of guilt for the October 30 bomb threat must be sustained; and as to the other four alleged bomb threats by defendant, double jeopardy does not bar a new juvenile hearing, at which defendant's October 24 confession may not be admitted.

### F. *Impartiality of Trial Judge*

 As a final point of appeal, defendant asserted at the intermediate appellate level that the juvenile court judge was pre-

---

**12.** 15 M.R.S.A. § 3203(2)(A) (Supp.1965–78) provides:

> When a juvenile is arrested, the law enforcement officer or the intake worker shall notify a parent, guardian or legal custodian of the juvenile without unnecessary delay and inform him of the juvenile's whereabouts, the name and telephone number of the intake worker who has been contacted and, if a juvenile has been placed in a detention facility, that a detention hearing will be held within 48 hours following this placement . . .

**13.** The Juvenile Code as originally enacted to be effective on July 1, 1978, provided a statutory exclusionary rule for any statements made by a juvenile in custodial interrogation by a law enforcement officer or intake worker, unless "a parent, guardian or legal custodian of the juvenile" or a lawyer was present. 15 M.R.S.A. § 3204, as enacted by P.L.1977, ch. 520, § 1. Before its effective date the exclusionary rule for statements made to law enforcement officers was deleted. P.L.1977, ch. 664, § 20, enacting 15 M.R.S.A. § 3204 (Supp.1965–78).

disposed to find her guilty. After an intensive review of the record prompted by the seriousness of such a charge, we cannot find any support whatever for her claim that she was denied a fair hearing before an impartial tribunal. Defendant claims that a brief interrogation by the judge of one witness and his *sua sponte* recalling of another, concerning the disruption of the educational program and the expense resulting from the bomb threats, demonstrates the judge's bias against her. However, Rule 614 of the Rules of Evidence expressly grants the trial court power to call or to question witnesses, M.R.Evid. 614(a), (b), "for the purpose of clarifying testimony, saving time, or preventing a miscarriage of justice . . . ." *State v. Greenwood*, Me., 385 A.2d 803, 804 (1978). The limited judicial intervention in this case was for the proper purpose of clarifying school board policy regarding the series of bomb threats—an area of inquiry initiated by defendant. This record reveals neither fact nor appearance of judicial bias.

### G. *Conclusion*

The Superior Court correctly set aside the first four adjudications based at least in part on the October 24, 1978, confession. On those charges defendant is entitled to a new hearing at which that confession is excluded.

On the other hand, the Superior Court erred in sustaining the juvenile's appeal from the adjudication of her guilt of terrorizing on October 30, 1978. The adjudication for that Class D offense should have been affirmed. However, in view of the reversal of the other four adjudications, all of which were for Class C offenses, we believe it most consistent with the purposes of the Juvenile Code that the Superior Court also remand that case, solely for the purpose of permitting the juvenile court an opportunity to reexamine the disposition for the sin-

gle adjudication of a Class D offense. Of course, no more serious disposition should be imposed. We do not express or imply any opinion whether the juvenile court should on review reduce its earlier disposition.

Accordingly, the entry is:

Appeal sustained in part and denied in part.

Judgment of the Superior Court vacated.

Remanded to the Superior Court for entry of the following judgment on defendant's appeal from the juvenile court:

"The court hereby sustains defendant's appeal in Juvenile Petitions Docket Nos. 78–9–J36 and 78–9–J37 and remands those matters to the District Court, Sixth District, Division of Knox, for a new hearing. The court hereby denies in part and sustains in part defendant's appeal in Juvenile Petition Docket No. 78–9–J35; the court affirms the adjudication therein, but sets aside the disposition and remands to said District Court for redisposition."

GLASSMAN, Justice, with whom GODFREY, J., joins, dissenting.

Because this Court has no jurisdiction to entertain this appeal, I respectfully dissent.[1]

The appeal provisions applicable to this case may be found in Chapter 509 of Title 15 of the Maine Revised Statutes.[2] Section 3401(1)(B) provides: "Judgments of the Superior Court in juvenile matters shall be reviewable by the Law Court." Other than this general jurisdictional grant, the only provision of the chapter dealing with appeals to the Law Court is Section 3407 which provides in pertinent part: "Appeals, for the purpose only of raising questions of law, from decisions of the Superior Court rendered in juvenile cases before the Superior Court on appeal from orders of juvenile courts, may be taken to the Law Court in

---

1. I disagree with only Part I of the opinion of the Court. I have no disagreement with Part II but would not reach the issues there considered because of lack of jurisdiction.

2. The appeal provisions of the Juvenile Code were substantially amended by P.L.1979, ch.

512, §§ 8–14. These new provisions became effective on September 14, 1979; therefore, they have no effect upon this case in which the appeal was filed on March 19, 1979 and docketed in the Law Court on March 22, 1979.

the same manner and form as appeals in adult criminal actions." To the extent that this language may be construed as ever authorizing the State to appeal to the Law Court, its appeal right under the Juvenile Code is coextensive with the authorization granted by 15 M.R.S.A. § 2115-A governing appeals by the State in adult criminal cases.[3] That section limited the State's right of appeal to pre-trial orders of certain types and to post-trial appeals from the Superior Court only when the defendant has appealed from the judgment. Thus, under the provisions of Section 2115-A as they existed, if an adult defendant were convicted in the Superior Court and appealed from the judgment, the State by way of cross-appeal might question any decision, ruling or order of the court made in the proceeding in which the judgment was entered.

The literal wording of these statutes does not grant the State the right to appeal in a juvenile case from a judgment of the Superior Court which sits as an intermediate appellate tribunal reviewing decisions of the juvenile court on questions of law. Although such a right of appeal might be found by way of implication or inference from the statutory language, we have unequivocally stated that the innovative nature of the statute granting the State the right to appeal precludes such methods of construction or interpretation. *State v. Fernald*, Me., 381 A.2d 282, 286 (1978); *State v. Kelly*, Me., 376 A.2d 840, 843 (1977). In *State v. Kelly, supra*, this Court commenced its analysis of the jurisdictional issue involved in State appeals in criminal cases by noting that the general grant of jurisdiction to the Law Court found in 4 M.R.S.A. § 57 did not include jurisdiction to hear appeals by the State in criminal cases. It reached this result because granting the State the right to appeal in criminal cases was recognized as such a "serious and far-reaching . . . innovation in the criminal jurisprudence of the United States . . . as well as the criminal jurisprudence of the State of Maine . . . ." *Id.* at 843.

The Court concluded that "rights of such substantive importance will not be taken to have been legislatively conferred by indirection or implication but only by legislation explicitly addressing the subject in express language of unmistakably plain meaning." *Id.* This reasoning is equally applicable to the grant of jurisdiction found in Section 3401(1)(B).

In the *Kelly* case, when the Court turned to construing the statute granting the State's right of appeal, it read that statute literally to invalidate a rule of court promulgated by the Supreme Judicial Court. In *State v. Fernald, supra*, this Court affirmed the principle announced in *State v. Kelly*, stating further: "As *Kelly* suggests, in view of the unprecedented nature of section 2115-A, the scope of the appeal rights conferred upon the State by the legislature are to be strictly construed and not extended beyond the plain and necessary meaning of the grant." 381 A.2d at 285.

I recognize that juvenile proceedings are not criminal in nature. *State v. Gleason*, Me., 404 A.2d 573 (1979). Yet, many of the procedural safeguards afforded adults in criminal proceedings must also be afforded juveniles in juvenile proceedings. As we had occasion to remark in *State v. Gleason, supra*, 404 A.2d at 580:

> [R]ecent decisions of this Court and the United States Supreme Court have shown that the procedural safeguards constitutionally required in adult criminal proceedings must be afforded a juvenile unless they would 'compel the States to abandon or displace any of the substantive benefits of the juvenile process.' *In re Winship*, . . . [397 U.S. 358,] at 367, 90 S.Ct. [1068,] at 1074, 25 L.Ed.2d [368,] at 377. Normal adult criminal procedures must be afforded to the extent consistent with the basic rehabilitative purposes of the juvenile justice system.

In *State v. Fernald, supra*, 381 A.2d at 285, we noted that restrictions on the State's right to appeal in criminal cases

---

3. The State's right of appeal in criminal cases was significantly expanded by P.L.1979, ch. 343, § 2, effective September 14, 1979, which repeals and replaces 15 M.R.S.A. § 2115-A.

"reflected an historical sensitivity to the defendant's constitutional guarantees of a speedy trial and freedom from being placed in double jeopardy." The Fifth Amendment guarantee of freedom from double jeopardy is fully applicable to juvenile proceedings. *Breed v. Jones*, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975). Although the constitutional guarantee of speedy trial has never been specifically held applicable to juvenile proceedings by the United States Supreme Court, certainly that procedural safeguard is not incompatible with the rehabilitative purposes of our Juvenile Code. Indeed, a speedy hearing is as important to a child in the toil of the juvenile justice system as it is to an adult in the snare of the criminal process.[4] The juvenile may be detained pending the hearing. *See* 15 M.R.S.A. § 3203. Whether or not detained, the juvenile should have a right to a reasonably speedy determination of whether he is to be subject to the restraint of the juvenile system. If he is to be adjudicated a juvenile offender, it should be done quickly in order that the rehabilitative processes of the juvenile system will be promptly available to him. Thus, the same underlying principles which required strict interpretation of the statutory grant of jurisdiction to hear appeals by the State in criminal cases apply with equal force to the similar grant to hear State appeals in juvenile cases.[5]

This conclusion is in no way affected by resort to the goals of the juvenile appellate process enumerated in Section 3401(2). I would assume that the general grant of appellate jurisdiction to this Court to hear appeals in criminal cases has as its objectives: "A. To correct errors in the application and interpretation of law; B. To insure substantial uniformity of treatment to persons in like situations; C. To provide for review of . . . court decisions so that the legislatively defined goals of the . . . [criminal] justice system as a whole are realized." *Id.* If those objectives were not sufficient to permit this Court to read into the broad grant of appellate jurisdiction found in 4 M.R.S.A. § 57 a right of the State to appeal in criminal cases, then they are not sufficient to permit this Court to read into the grant of jurisdiction in 15 M.R.S.A. § 3401(1)(B) a right of the State to appeal in juvenile cases.

Nor is the conclusion undermined by resort to the prior law governing appeals to the Law Court in juvenile cases. 15 M.R.S.A. § 2667 (repealed, P.L.1977, ch. 520, § 22). That section did not address the question of who might take an appeal. Like 4 M.R.S.A. § 57 and 15 M.R.S.A. § 3401(1)(B), the provision was a mere grant of jurisdiction to the Law Court to hear appeals without any specification of who might take such an appeal. It is instructive to note that this statute was first enacted in 1959 (P.L.1959, ch. 342, § 1); one may search in vain through the reports of the decisions of the Law Court during the almost twenty years of that statute's existence for a single instance in which there was an appeal by the State from a decision of the Superior Court in a juvenile case. This demonstrates most clearly that appeal

---

4. "Immediately upon the filing of the petition, a date for the hearing should be set. This date should allow adequate time for a proper social study but should not be unduly distant, ordinarily not more than 20 days from the date of filing . . . . The cases of children held in detention should be heard as soon as possible, on a priority basis, and considerably within the 20-day limitation mentioned above. All concerned should constantly keep in mind the fact that *parents and children have a right to legal determination of their rights as soon as possible.*" (emphasis added). W. Sheridan, Standards for Juvenile and Family Courts 64 (U. S. Dep't of Health, Education and Welfare, Children's Bureau, Pub. No. 437 (1966)); *see* National Council on Crime and Delinquency,

Council of Judges, Model Rules for Juvenile Courts, Rule 19 (1969); National Advisory Committee on Criminal Justice Standards and Goals, Juvenile Justice and Delinquency Prevention, Standard 12.1 (1976).

5. In the instant case, the order of the Superior Court remanding this matter to the juvenile court was entered February 28, 1979. The State's appeal to the Law Court was argued September 14, 1979. While not suggesting that the juvenile has been denied a right to speedy rehearing, the appellate process has delayed the rehearing in the juvenile court at least seven months.

by the State in juvenile cases is, indeed, "an innovation in . . . the . . . jurisprudence of the State of Maine." *State v. Kelly, supra,* 376 A.2d at 843.

The statutes here involved do not "in express language of unmistakably plain meaning," *id.,* grant the State the right to appeal to this Court. Although, through inference and implication, they may be construed to grant that right, the institutional integrity of this Court is not enhanced by giving them such a construction when we have so recently stated that similar statutes having similar purposes must be narrowly, strictly and literally construed.[6] *See State v. Fernald, supra,* 381 A.2d at 285; *State v. Kelly, supra,* 376 A.2d at 843.

Construing the Juvenile Code in the manner mandated by this Court's decisions in *Kelly* and *Fernald,* I cannot read into it a right to appeal by the State from the Superior Court when that court, sitting as an intermediate appellate tribunal, makes rulings adverse to the State. The Law Court has no jurisdiction to hear this appeal. The appeal should be dismissed.

---

**6.** Strict construction of the newly enacted § 2115–A is rejected by subsection 6 of that section which now reads: "The provisions of this section shall be liberally construed to effectuate its purpose, or purposes, of insuring that the State is able to proceed to trial with all the evidence it is legally entitled to introduce, in view of the limited ability of the State to have error reviewed after trial." P.L.1979, ch. 343, § 2.